# BERNARD WILLIAM SCOTT BROWN

## V.

# COMMONWEALTH OF VIRGINIA

Record No. 841210

November 27, 1985

Present: All the Justices

*Jeffrey M. Gleason (Deborah C. Wyatt; Martin & Martin; Gordon & Wyatt*, on briefs), for appellant.
*Lucy H. Allen, Assistant Attorney General (William G. Broaddus, Attorney General*, on brief), for appellee.

POFF, J., delivered the opinion of the Court.

We granted this appeal to consider whether prosecuting a charge of abduction with intent to defile, following convictions for rape and forcible sodomy at a prior trial, constitutes double jeopardy when the charges arise out of the same criminal episode.

In a voluntary statement made to the police following his arrest, defendant Bernard William Brown admitted all the relevant facts as detailed by the victim at trial. On December 10, 1983, the victim was in a parking lot in the City of Charlottesville preparing to enter her car. Brown approached the car and asked her for a ride to the bus station. She refused, entered her car, and started the engine. Brown opened the driver's door, struck the victim on the side of her head, forced her to move into the passenger's seat, and sat down beside her. The victim testified that Brown "put his hand in his pocket and he said don't try anything, don't go for the door, I'll cut you." The defendant then drove out of the city and parked at a spot in Albemarle County where he raped and sodomized the victim and forced her to sodomize him.

A Charlottesville grand jury returned an indictment for abduction (later amended to abduction with intent to defile), and an Albemarle County grand jury indicted Brown for rape and forcible sodomy. At the Commonwealth's request, the Albemarle General District Court conducted a single preliminary hearing on all three charges. Brown then moved the Circuit Court of the City of Charlottesville to change the venue on the abduction charge to Albemarle County so that the three charges could be tried jointly. The Commonwealth objected, and the court denied the motion.

On April 30, 1984, an Albemarle County petit jury convicted Brown of rape and forcible sodomy. Confirming the jury verdict, the court imposed a sentence of 40 years for rape and 60 years for forcible sodomy, with the sentences to run consecutively.

Brown then moved the Charlottesville court to dismiss the abduction indictment on double jeopardy grounds. The trial court denied the motion, arraigned the accused, and empanelled a jury. Presented with substantially the same evidence adduced at the Albemarle County trial, the Charlottesville jury convicted Brown of abduction with intent to defile and fixed his penalty at 20 years in the penitentiary. Brown appeals from the final judgment imposing that penalty.

■ The double jeopardy clause of the Fifth Amendment provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb. . . ." It is now well recognized that this clause affords an accused three distinct constitutional guarantees. "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against

multiple punishments for the same offense." *North Carolina* v. *Pearce*, 395 U.S. 711, 717 (1969). Brown's challenge on this appeal invokes the second and third guarantees. We consider first whether imposition of the penalty on the abduction conviction violates the guarantee against multiple punishments.

■ Brown argues that he cannot be punished for both rape[1] and abduction with intent to defile arising out of a continuing criminal enterprise because such conduct constitutes the same offense under the test articulated in *Blockburger* v. *United States*, 284 U.S. 299 (1932). "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id.* at 304.

In *Scott* v. *Commonwealth*, 228 Va. 519, 526, 323 S.E.2d 572, 576 (1984), we held that the abduction statute, Code § 18.2-47, changed the common-law rule requiring proof of asportation so that proof of mere detention is sufficient. Relying upon *Scott*, Brown contends that, because every rape involves some form of detention, abduction with intent to defile is necessarily a part of the crime of rape and that a "stacking" of separate charges, even though prosecuted in a single trial, violates the double jeopardy guarantee against multiple punishments for the same offense.[2]

We anticipated this argument but found it unnecessary to adjudicate the question in *Scott*. "[I]n rape, robbery, and assault cases there is usually some detention, and often a seizure, of the victim. The constitutional problems which may be created by such an overlapping of crimes are, however, not before us for decision in this case." 228 Va. at 526, 323 S.E.2d at 576.

■ The issue is squarely before us now. We do not agree that resolution of the question is controlled by the *Blockburger* test. The Supreme Court has decided that this test need not be applied when the intent of the legislature can be gleaned from a reading of the relevant statutes. *Garrett* v. *United States*, 471 U.S. 773, ——, 105 S.Ct. 2407, 2412 (1985). "Where the same conduct violates two statutory provisions, the first step in the double jeopardy analysis is to determine whether the legislature . . . intended that each violation be a separate offense." 105 S.Ct. at

---

[1] For the sake of clarity, we refer to the Albemarle County charges in the singular.

[2] Brown concedes that abduction with intent to defile is not lesser-included in the offense of rape, because the minimum penalty for the former is greater than that for the latter.

2411. *See also Missouri* v. *Hunter*, 459 U.S. 359, 368 (1983); *Albernaz* v. *United States*, 450 U.S. 333, 340 (1981); *Whalen* v. *United States*, 445 U.S. 684, 691-92 (1980).

■ We adhere to our decision in *Scott* that detention is a discrete species of abduction. We are of opinion, however, that in the enactment of the abduction statute the General Assembly did not intend to make the kind of restraint which is an intrinsic element of crimes such as rape, robbery, and assault a criminal act, punishable as a separate offense. The Supreme Court of North Carolina, construing the kidnapping and sex-offense statutes in that state, reached the same conclusion. *State* v. *Fulcher*, 294 N.C. 503, 243 S.E.2d 338 (1978).

We hold, therefore, that one accused of abduction by detention and another crime involving restraint of the victim, both growing out of a continuing course of conduct, is subject upon conviction to separate penalties for separate offenses only when the detention committed in the act of abduction is separate and apart from, and not merely incidental to, the restraint employed in the commission of the other crime. Other courts follow a similar rule. *See Iowa* v. *Folck*, 325 N.W.2d 368 (Iowa 1982); *Bass* v. *State*, 380 So.2d 1181 (Fla. App. 1980).

■ The evidence in the record before us shows that the detention underlying the abduction conviction was not the kind of restraint that is inherent in the act of rape. Abduction was established as a fact once the Commonwealth proved that Brown had deprived his victim of her liberty by physical assaults and threats of violence. It is true that the abduction was prolonged by asportation, but the initial offense was remote in terms of time and distance from the sexual assault and, in terms of quality and quantity, the acts of force and intimidation employed in the abduction were separate and apart from the restraint inherent in the commission of the rape.

Applying the rule we have announced, we hold that the abduction and the rape were different offenses and that the several penalties imposed do not offend the double jeopardy guarantee against multiple punishments.

This holding does not end our inquiry. We must consider now whether the double jeopardy guarantee against successive prosecutions applies here. Brown argues on brief that the Supreme Court has fashioned "a more flexible test than the rigid *Blockburger* test that will operate to block a successive prosecution after conviction,

even when the *Blockburger* test is not satisfied." The flexible test, he continues, "looks at the evidence actually relied on in the initial prosecution and . . . [if] the same evidence will be relied on in a subsequent prosecution . . . double jeopardy will bar the second prosecution." We believe Brown misstates the rule he invokes.

Brown refers us to a footnote in an opinion where the Supreme Court said that "successive prosecutions will be barred in some circumstances where the second prosecution requires the relitigation of factual issues already resolved by the first." *Brown* v. *Ohio*, 432 U.S. 161, 166 n.6 (1977). By way of example, the *Brown* Court cited *Ashe* v. *Swenson*, 397 U.S. 436 (1970), and *In re Nielsen*, 131 U.S. 176 (1889). In *Ashe*, the defendant had been acquitted of robbing one of a group of poker players. Applying collateral-estoppel principles, the Court held that a second prosecution for robbery of other members of the group was barred because the factual question of his presence at the robbery had been litigated and resolved in his favor by the verdict in the first prosecution. In *Nielsen*, the defendant had been convicted of unlawful cohabitation with two wives and then tried and convicted in a second trial of adultery with one of the women. The Court ruled that because unlawful cohabitation was "a crime which has various incidents included in it, [the defendant] cannot be a second time tried for one of those incidents". *In re Nielsen* at 188. The proper test is not whether the prosecution presented the same evidence in both trials, but whether "the evidence required to support a conviction upon one of [the charges] would have been sufficient to warrant a conviction upon the other." *Id.*, quoting *Morey* v. *Commonwealth*, 108 Mass. 433, 434 (1871).

As another example of circumstances which he believes justifies application of the same-evidence rule, Brown cites *Jordan* v. *Commonwealth of Virginia*, 653 F.2d 870 (4th Cir. 1980). There, Jordan was convicted of the misdemeanor of obtaining a controlled drug by using a forged prescription and, in a second trial, of felonious possession of the same substance. The Court reversed the second conviction on double jeopardy grounds because "the evidence necessarily used by the government in prosecuting the earlier misdemeanor charge would totally have sufficed to sustain the later felony conviction." 653 F.2d at 874.

As we have said, Brown's position is that when the evidence relied upon in the second trial is the same as "the evidence *actually* relied on in the initial prosecution [emphasis added]", the

second prosecution is constitutionally barred. But, as the cases we have discussed plainly teach, the double-jeopardy guarantee against successive prosecutions applies only when the evidence necessary to support the second conviction was "necessarily used" or "required" to prove the first offense or "where the second prosecution requires the relitigation of factual issues already resolved by the first."

■ True, the Commonwealth introduced evidence of Brown's conduct in the parking lot in both trials. While that evidence was necessary to convict in the abduction trial, it was not required for a conviction in the earlier rape trial. The victim testified that Brown parked her car in Albemarle County "out in the middle of nowhere", told her to undress, and "grabbed [her] hair and started pulling [her] head way back and kept, with his voice, getting more and more violent". "[H]is hand came up to my throat," she said, and "all of his weight was coming down on me and . . . I could hardly breathe."

Entirely aside from the proof of Brown's conduct in the parking lot, this testimony and the uncontradicted evidence of penetration was sufficient to establish that Brown had "sexual intercourse with a female . . . against her will, by force, threat or intimidation". Code § 18.2-61.

■ Some overlap in evidence is inevitable when separate offenses arising out of the same criminal episode are prosecuted in separate trials. This, without more, does not constitute double jeopardy. Because it is clear that the evidence necessary to support Brown's conviction in the abduction trial was not required to prove the crime of rape in the first trial, we reject the defendant's constitutional challenge, and we will affirm the judgment entered below.

*Affirmed.*

OLSTEN OF RICHMOND, ET AL.

V.

SHIRLEY W. LEFTWICH

Record No. 841783

November 27, 1985

Present: All the Justices

*Donald S. Elmore (L. Bradford Haskin; Elmore and Parker*, on brief), for appellants.
*C. Willard Norwood* for appellee.

POFF, J., delivered the opinion of the Court.

This is an employer's appeal from the Industrial Commission's order awarding an employee workers' compensation benefits for disability resulting from an accident during the course of employment. The principal question posed is whether the accident arose out of the employment.

In June 1982, Shirley W. Leftwich suffered a cervical and lumbar sprain in an automobile accident. In September, she returned to work at Olsten of Richmond where she was employed as a customer representative. On a weekend in January 1983, Olsten moved its offices to a new location. Mrs. Leftwich reported for work on Monday, January 17, expecting to resume her regular duties. Although she was dressed as usual in high-heel shoes, Olsten directed her to work with other employees in moving and unpacking the boxes and storing the contents on shelves in a closet.

After working at her new task for more than an hour, Mrs. Leftwich suffered a sudden, severe pain in her back. Unable to straighten to a standing position, she was placed on a stretcher and transported by rescue squad to a hospital where she remained for five weeks under the care of Dr. John A. Ayers, II, a specialist in orthopedic surgery.

Dr. Ayers diagnosed her injury as severe lumbar sprain. In a report dated March 4, 1983, he stated, "It is my impression that

the injury of January 17, 1983 was an exacerbation of her previous injury of June 10, 1982 from which she was still having minor residuals." Based on an examination conducted later, Dr. Herman Nachman, another orthopedist, opined that Mrs. Leftwich's condition "was not the result of the injury received in the June 10, 1982 [accident] but rather . . . the incident that occurred at work on January 17, 1983."

Danna Kinard, Olsten's branch manager and Mrs. Leftwich's supervisor, was standing beside Mrs. Leftwich when the January accident occurred. Kinard testified that Mrs. Leftwich "had high heels on and she bent over . . . and picked up the side of the box and got it off the floor". As she "was beginning to pull it up . . . she screamed with pain . . . broke out in a sweat . . . and she dropped the box."

A deputy commissioner denied the claimant's application for benefits. Upon review, the full Commission found that Mrs. Leftwich's disability was caused by "an exacerbation of a prior injury", reversed the deputy's decision, and entered an award in favor of the claimant.

■ On appeal, Olsten and its insurer, Travelers Insurance Company, contend that there was no evidence to show that the injury arose out of the employment. We disagree. The work in progress was work specially assigned by the employer. Mrs. Leftwich suffered an "injury by accident". Code § 65.1-7. That injury, which we have defined as an "obvious sudden mechanical or structural change in the body", *Virginia Electric, Etc., Co.* v. *Quann*, 197 Va. 9, 12, 87 S.E.2d 624, 626 (1955), occurred while she was engaged in a new work assignment involving physical exertion to which she was unaccustomed.

■ "In Virginia we have adopted the 'actual risk test,' which requires only that the employment expose the workman to the particular danger from which he was injured, notwithstanding the exposure of the public generally to like risks." *Lucas* v. *Lucas*, 212 Va. 561, 563, 186 S.E.2d 63, 64 (1972) (citation omitted). The testimony of the employer's district manager shows that the January accident occurred while Mrs. Leftwich was exposed to a particular danger. Medical reports submitted by two specialists confirm that Mrs. Leftwich's disability was caused by the accident resulting from that danger. It is immaterial whether her work incapacity was related solely to the injury sustained in the January accident. "When an injury sustained in an industrial accident ac-

celerates or aggravates a pre-existing condition, . . . disability resulting therefrom is compensable under the Workers' Compensation Act." *Ohio Valley Construction Co. v. Jackson*, 230 Va. 56, 58, 334 S.E.2d 554, 555 (1985).

We hold, therefore, that the evidence supports a finding that the claimant's disability was causally related to an accident which arose out of the claimant's employment. *Cf. United Parcel Service of America v. Fetterman*, 230 Va. 257, 336 S.E.2d 892 (1985) (this day decided); *Central State Hospital v. Wiggers*, 230 Va. 157, 335 S.E.2d 257 (1985).

Nevertheless, the employer urges us to reverse the award on the ground that the claimant was "bound by the words from her own mouth" and hence, that the Commission erred in considering Kinard's testimony and the medical evidence. In support of this assignment of error, the employer relies upon *Massie v. Firmstone*, 134 Va. 450, 462, 114 S.E. 652, 656 (1922), where we said that a litigant "cannot be heard to ask that his case be made stronger than he makes it where . . . it depends upon facts within his own knowledge and as to which he has testified."

At one point in her testimony before the deputy commissioner, Mrs. Leftwich said, "I did not get under the whole box." She explained that "some of the boxes were big boxes with a lot of boxes in them." Asked whether she had "touched" the big box, she replied, "I honestly—I did not know. I don't know whether I picked it up. I don't know."

As we have said, the principal issue on appeal, as it was below, is whether the claimant's injury arose out of her employment. We assume, without deciding, that the employer is correct in its view that resolution of this issue depends upon whether Mrs. Leftwich was in the act of lifting the box at the moment the injury occurred. Even so, we reject the assignment of error.

■ "No rule is more firmly established in Virginia than that of *Massie v. Firmstone.*" *Travis & Ludwig v. Bulifant*, 226 Va. 1, 4, 306 S.E.2d 865, 866 (1983). But the employer misconceives the scope of the rule as we have refined it. If the testimony of a litigant "in its entirety does not unequivocally show that his case is without merit or if reasonable men may differ as to its effect, 'the [factfinder] must be permitted to pass upon the testimony and the effect thereof, taken together with all the other evidence in the case.' " *Saunders and Rittenhouse v. Bulluck*, 208 Va. 551, 553, 159 S.E.2d 820, 823 (1968), quoting *VEPCO v. Mabin*, 203 Va.

490, 494, 125 S.E.2d 145, 148 (1962); *accord Seven-Up Bottling Co.* v. *Moseley*, 230 Va. 245, 249, 335 S.E.2d 272, 275 (1985).

Considering Mrs. Leftwich's testimony in its entirety and in context with all the other evidence before the Commission, we cannot say that her claim is without merit. Given the fact that she had been engaged in a series of lifting operations for more than an hour, a factfinder could reasonably conclude, as the Commission obviously did, that her recollection of the sequence of events was simply confused. The *Massie* doctrine "is intended to compel the exercise of good faith on the part of a litigant not to penalize him for honest mistakes or infirmities of memory", *Burruss* v. *Suddith*, 187 Va. 473, 482, 47 S.E.2d 546, 550 (1948), and we will not apply it here.

We hold that the Commission applied correct principles of law to the facts before it, and we will affirm the award.

*Affirmed.*

JOE LOUIS WISE

V.

COMMONWEALTH OF VIRGINIA

Record Nos. 841900 & 850232

November 27, 1985

Present: All the Justices

324

*William B. Claiborne* for appellant. (Record Nos. 841900 and 850232).

*Margaret Poles Spencer, Assistant Attorney General (William G. Broaddus, Attorney General,* on brief), for appellee. (Record Nos. 841900 and 850232).

POFF, J., delivered the opinion of the Court.

In a consolidated trial, a jury convicted Joe Louis Wise of capital murder in the commission of armed robbery, armed robbery, use of a firearm in the commission of a felony, and grand larceny. The trial court confirmed the four verdicts and imposed penitentiary sentences of life for robbery, two years for the use of a firearm, and 20 years for grand larceny. In a separate proceeding, *see* Code §§ 19.2-264.3 and -264.4, the jury fixed the penalty for the capital conviction at death, and the court entered final judgment imposing the sentence. We have certified Wise's appeals in the non-capital cases to this Court, *see* Code § 17-116.06(B)(1), combined those appeals with his capital appeal and the penalty review mandated by Code § 17-110.1, and accorded the several proceedings priority on our docket, *see* Code § 17-110.2.

We will consider the questions presented as stated on brief by the defendant. All but two are addressed to the conduct of the guilt phase of the consolidated trial. Wise challenges the selection of the jury, several evidentiary rulings, certain conduct of the attorney for the Commonwealth, and the sufficiency of the evidence. Concerning the penalty phase of the capital trial, Wise contends that the death penalty was the product of passion or prejudice and was disproportionate to the penalty imposed in similar cases.

## SELECTION OF THE JURY

Prospective jurors were questioned individually and privately. The trial court seated three veniremen over Wise's challenge for cause. The court should have stricken John L. Tucker, Wise argues, because "he had a long standing friendship with the Commonwealth's Attorney and [they] had been golfing buddies on many occasions."

■ We have held that a prospective juror is not disqualified to sit on a criminal case solely because he has a familial or an attorney-client relationship with the Commonwealth's Attorney. *Calhoun* v. *Commonwealth*, 226 Va. 256, 263, 307 S.E.2d 896, 900 (1983); *accord Elam* v. *Commonwealth*, 229 Va. 113, 116, 326 S.E.2d 685, 687 (1985). It follows that a social relationship, standing alone, is no cause for disqualification. *See Lane* v. *United States*, 321 F.2d 573 (5th Cir. 1963), *cert. denied*, 377 U.S. 936 (1964). Tucker's responses to questions from the bench clearly negate any danger of bias.

Prospective juror Gladys McKinney should not have been seated, Wise says, because she "gave vague answers", "stated she was confused", and raised "grave questions about her ability to sit impartially as a juror." McKinney had read newspaper articles about the crimes and Wise's arrest. She thought "it was a terrible thing that happened" and "justice ought to be done". Asked by defense counsel if Wise "should have been arrested", she replied, "Yes."

Wise argues that McKinney's answer reflects an opinion that he was guilty because he was arrested. But the standard for arrest of a suspect is probable cause; the standard for conviction of an accused is proof beyond a reasonable doubt. The fact that McKinney thought Wise should have been arrested as a suspect does not show that she thought he deserved to be convicted. In unequivocal answers to searching inquiries by the court, McKinney declared that what she had learned from the newspapers would not affect her impartiality or ability to give Wise a fair trial, that she was not sensible of any bias or prejudice against the defendant, and that she could enter the jury box with an open mind and wait until the entire case was concluded before reaching a fixed opinion about the guilt or innocence of the accused.

■ Looking to the "entire *voir dire* rather than the single answer and question", *Fitzgerald* v. *Commonwealth*, 223 Va. 615, 628, 292 S.E.2d 798, 805 (1982), *cert. denied*, 459 U.S. 1228

(1983), we uphold the trial court's finding that McKinney was qualified to sit on this jury.

■ Prospective juror Rebecca Hood stated that she believed in capital punishment. "How strong do you believe in it?" defense counsel inquired. "If the evidence calls for it," she replied. Pressed further, Hood explained that she meant "[t]he evidence presented in this courtroom." We find nothing in this dialogue or elsewhere in the *voir dire* to support the defendant's argument on appeal that Hood's "state of mind is such that she could not give the defendant a fair trial."

## THE EVIDENCE OF RECORD

We review the facts in the light most favorable to the Commonwealth. The victim of these crimes was William Ricketson, a superintendent at the Mecklenburg Correctional Center. About 4:00 p.m. on December 1, 1983, Ricketson prepared to leave his home in Boydton to get a haircut and go deer hunting on property near Chase City. He laid $12.00 on a table for household expenses, but his wife told him he would need the money to pay for his haircut. Ricketson left in a white Ford pickup truck carrying a rifle and a shotgun. At Chase City, he got a haircut and bought a soft drink and a candy bar. He paid the bills with money taken from a wallet kept in his pants pocket.

At 1:00 p.m. the next day, Ricky Symmonds, a North Carolina deputy sheriff, stopped to investigate a white pickup parked on the shoulder of the southbound lane of Interstate Route 95. The defendant was adding oil to the engine. A service station attendant had informed the police that the driver of the pickup was armed. The officer recovered a .25 caliber pistol from Wise's pocket, arrested him for carrying a concealed weapon, and locked him in the county jail. The pickup was registered in Ricketson's name. During an inventory search of the vehicle, the police seized two shotguns. One was later identified as a gun Wise had taken to a gun shop for repairs and the other as a gun Ricketson used for hunting. On Wise's person, the police discovered two wallets. One contained Wise's driver's license; the other was empty.

On the same afternoon, Ernest Mitchell, a resident of Middlesex, North Carolina, reported to the Mecklenburg sheriff's department that Wise had told him and other friends that he had killed a man and "put him in a hole" behind the old excelsior plant in Chase City. The plant had been converted for use as a flea mar-

ket, and the office was used as a residence. Investigating officers found blood at a point on the shoulder of the road near the building. A trail of blood led from the road to the driveway, across a sidewalk, and then to the edge of a hole in the ground behind the building. The hole, which had been dug for use as an outdoor toilet, was filled with water, mud, and human feces. From this hole, the officers recovered Ricketson's body which had been completely submerged under the weight of a number of cinder blocks. Ricketson's trousers had been pulled down, inside out, to the top of his boots, and his wallet was missing.

An autopsy revealed multiple injuries resulting from blunt-force blows to the head, including scalp wounds and a skull fracture. Three fingers were broken, and flesh had been torn from the nose, chin, and forehead. A bullet fired at close range had perforated the right eyeball and lodged near the surface behind the left ear. A ballistics test showed that this bullet had been fired from the .25 caliber pistol taken from Wise when he was arrested.

Ricketson had also suffered a chest wound from a shotgun blast. The pellets were recovered from a point just beneath the skin. According to a forensic scientist, the shallow penetration supports the conclusion that the victim was under water when the gun was fired. The medical examiner found "water and clay and gritty sand" in the nose, mouth, lungs, and stomach of the body which, he said, showed that the victim had "breathed and swallowed the muddy water with the sand and the grit when he was alive." The gunshot wounds and the skull fracture were lethal injuries, but drowning was the ultimate cause of death.

Called as a witness for the Commonwealth, Shirley Whittaker testified that Wise came to her trailer home in Middlesex between 1:00 a.m. and 2:00 a.m. on December 2, 1983. Wise told her that "he had just killed a man", that "he shot the man in the eye", that "he took the man outside the house, around the house, he beat the man with the gun and broke the gun handle over the man's head", that he threw the man in a "hole that they had dug around the back of the house for a toilet", and that he "threw some dirt over him and bricks." Wise declared that "the man had only six dollars." Responding to a question posed by defense counsel, Whittaker added, "He said he got it out of the man's pocket." Wise was wearing a green coat stained with blood. "He pulled that off," Whittaker said, "and carried it out and burned it up."

Before Wise left, Whittaker called her next-door neighbor, Mary Booth, to come to her trailer. Booth testified that Wise, her stepson, told her that he had shot an intruder when he reached for his pocket and that he took him outside and "beat him and then he put him in a hole." Booth saw a .25 caliber pistol, a shotgun with a broken stock, and a driver's license bearing Ricketson's name, all lying on the floor of the trailer. Ricketson's wife identified the shotgun as the one her husband carried the day of the crimes.

In response to a telephone call from Mary Booth, Clarice Bowser drove to the trailer. Bowser testified that Wise told her that he had surprised a stranger at the excelsior plant, that "the man went for his pocket and he said he shot the man . . . [and] he drug him behind the house and put him in a hole".

Wise made eight statements concerning the crimes with which he was charged. In addition, while incarcerated awaiting trial, he requested, took, and failed a lie detector test, agreed to give testimony by deposition, and participated in a recorded telephone conversation with Whittaker. The results of the polygraph test, the contents of the statements and the deposition, and portions of the tape recording were admitted into evidence without objection.

Wise changed his story repeatedly. In some of his statements, he implicated third parties in one or more of the several offenses. In his first statement, he denied any knowledge of the crimes. Three days later, he said he had returned to the plant and found Ricketson "out in the shop". Ricketson "made some kind of move toward his back pocket and I shot him with the .25 automatic. I drug him outside and around the house. I left him on the side of the house. I didn't put him in no hole."

In his third statement, Wise admitted the shooting but said that a man named Frank Craddock had beaten Ricketson with a shotgun. According to his fourth statement, Wise was inside the building when "some man pulled up in the yard in a white truck" and "used the yard for a bathroom." Wise went outside and confronted the man, and a fight ensued. Ricketson started towards the truck, Wise "shot him at close range", Ricketson "fell close to the road", and Wise "picked him up . . . and dragged him around the house." Contradicting his former account, Wise admitted that Frank Craddock "won't [sic] there," and that "I did all this alone." Asked why he had "put this man in a hole", he replied, "I don't know, I just did it."

On December 12, Wise asked for a fifth interview and signed a transcript of the dialogue. He told the police that he had struck Ricketson twice in the head with a shotgun, that he had put him in the hole because there "was water in the hole and I wanted to move the body out of sight in case someone came in the yard", that he shot Ricketson "[w]hile he was in the hole", that "he won't [sic] dead when I shot him with the shotgun", and that he had acted entirely alone. Ricketson's billfold "was on the dashboard of the truck."

Wise's sixth statement was contained in two letters he wrote to a deputy sheriff later in December. His former statements were false, he said, "because I was afraid and I was paid [$200.00] by one John Spruill to keep my mouth shut". Wise declared that Spruill shot Ricketson "with a .25 caliber pistol . . . hit the man with the rifle . . . drug the man to a hole and then shot into the hole."

In January, Wise made a seventh statement in a telephone interview with the police. On this occasion, Wise said that Shirley Whittaker shot Ricketson with the pistol, that Ernest Mitchell beat him with the shotgun, that Mitchell and Ray Booth, Wise's father, "pulled his pants down", "took his billfold", "dragged him by the legs", and "put the man in the hole", and that Ray Booth "shot in the hole". Repeating this account in a formal deposition, Wise claimed that his earlier confessions had been made to protect his father.

Called as adverse witnesses by the accused, Shirley Whittaker and Clarice Bowser repeated the testimony they had given as witnesses for the Commonwealth. In addition, Whittaker said that Wise had told her that he knew that "the man didn't have but six dollars on him . . . [b]ecause I looked in his pocketbook and that's all the man had." Whittaker tape-recorded a telephone call Wise made to her in December while he was awaiting trial. She did so because she "was going to show this tape" in the event "Joe Wise would have got on the stand and implicated John Spruill and [Frank Craddock]." The Commonwealth offered the tape as an exhibit, the defendant waived objection, and the recording was played for the jury. Wise admitted that he shot Ricketson with the pistol, that he "beat him with his shotgun . . . throwed him in the hole, shot in the hole" and that no one else was present. "I didn't have . . . but six dollars," he said, "and I put that in the [gasoline] tank" because it was half empty.

## EVIDENTIARY QUESTIONS

### A. *Photographs*

The Commonwealth introduced three color photographs of the corpse as it was being lifted from the privy hole. The defendant argues that "[a]lthough these photographs . . . may have had some probative value, it was outweighed by the prejudicial and inflammatory nature of the photographs."

■ The pictures show the body covered with mud and other debris but no blood. The face is not shown, and the head and body wounds are not visible. The arms are positioned near the head in a defensive posture. While the pictures arouse one's pity, they are not inflammatory within the meaning of the rule Wise invokes. Compare photographs admitted in *Boggs* v. *Commonwealth*, 229 Va. 501, 508, 331 S.E.2d 407, 419 (1985); *Stockton* v. *Commonwealth*, 227 Va. 124, 144, 314 S.E.2d 371, 384, *cert. denied*, 469 U.S. 873 (1984); *Whitley* v. *Commonwealth*, 223 Va. 66, 74, 286 S.E.2d 162, 167, *cert. denied*, 459 U.S. 882 (1982); *Waye* v. *Commonwealth*, 219 Va. 683, 692, 251 S.E.2d 202, 207-08, *cert. denied*, 442 U.S. 924 (1979); and *Newberry* v. *Commonwealth*, 191 Va. 445, 455, 61 S.E.2d 318, 323 (1950).

■ "We have repeatedly held that the admissibility of photographs depicting the body of a murder victim is a matter within the sound discretion of the trial court." *Jones* v. *Commonwealth*, 228 Va. 427, 450, 323 S.E.2d 554, 566-67 (1984), *cert. denied*, 105 S.Ct. 2713 (1985). We find no abuse of discretion. The circumstances reflected in the pictures at bar were clearly competent to show that the homicide was deliberate and malicious.

### B. *Confrontation*

An investigating officer testified that Ernest Mitchell had been the first to report Wise's admission that he had killed a man and that Mitchell had directed the police to the broken shotgun and other items introduced at trial. The Commonwealth did not call Mitchell as a witness, and Wise complains that he was denied his right to confront one of his accusers.

■ "The Commonwealth was not required to call every possible witness in proving its case", *Robinson* v. *Commonwealth*, 207 Va. 66, 69, 147 S.E.2d 730, 732 (1966) (instruction on absent-witness presumption properly refused), and evidence adduced by the defendant himself shows that Mitchell's testimony "would have been

merely cumulative and corroborative and, thus, unnecessary." *Id.* Defense counsel asked a deputy sheriff who had interviewed Mitchell to read his statement to the jury. In that interview, Mitchell repeated what he had reported to the police the day after the murder and added that Wise had left the shotgun at his house.

Moreover, Mitchell was in jail at the time of Wise's trial and subject to compulsory process, at Wise's request, as a hostile witness. Finding no reason to believe that Wise was prejudiced by the Commonwealth's failure to call Mitchell to the stand, we reject the defendant's complaint.

## C. *Exclusion of Testimony*

Before the court adjourned for the day on Friday, defense counsel reserved the right to recall Commonwealth witnesses Whittaker, Booth, and Bowser, and the trial judge recognized them for appearance on Monday. Before court convened that day, the witnesses, residents of North Carolina, informed the Commonwealth's Attorney that they had no money to pay a babysitter while they were in Virginia and that their attorneys had advised them they were not legally obligated to appear. The trial judge granted Wise a continuance until Wednesday and authorized the Commonwealth's Attorney to use money from the sheriff's fund to pay babysitter fees.

Whittaker and Bowser appeared on Wednesday, and Wise called Whittaker as an adverse witness. Counsel attempted to ask why she had not appeared on Monday, and the court sustained the Commonwealth's objection. Assigning error to that ruling, the defendant argues that an answer to the question was relevant to the "state of mind and the credibility of a witness" and that, given an answer, the jury might have assessed the witness' adverse testimony "in a different manner."

While Whittaker was still on the stand, the Commonwealth's Attorney explained to the jury, at the court's request, that the witnesses were absent on Monday because they had no one to care for their children and that, pursuant to the court's instruction, he had made a trip to North Carolina and given "these ladies twenty dollars apiece for babysitter fees."

Because the record shows that the jury was fully apprised of the reason for the witnesses' reluctance to appear and the circumstances under which they agreed to appear, we find no merit in the assignment of error.

### D. *Allegations of Prosecutorial Misconduct*

Wise contends that he was prejudiced by the Commonwealth's questions concerning evidence which the trial court had excluded. The officer who conducted the interview with Wise on December 12 testified that, after Wise signed the transcript, he asked Wise if he had found any money in Ricketson's billfold. Wise replied, "Hell, man, it was only six dollars." Wise objected on the ground the *Miranda* waiver he had signed prior to the interview did not extend to the verbal admission. The trial court sustained the objection and instructed the jury to disregard the question and answer.

In two questions posed later in his examination of this officer, the Commonwealth's Attorney inquired whether Wise had said anything about money in the billfold. Noting that the jury had been instructed to disregard the officer's testimony on that point, the trial judge denied Wise's motion for a mistrial.

For purposes of this appeal, we assume that the trial court's ruling on the *Miranda* question was correct. *But see Washington v. Commonwealth*, 228 Va. 535, 548-49, 323 S.E.2d 577, 586 (1984), *cert. denied*, 105 S.Ct. 2347 (1985). We also accept Wise's view that the questions at issue were improper, and we consider whether the trial court committed reversible error in denying a mistrial.

> "[E]rror arising from an improper question or improper conduct of counsel may usually be cured by prompt and decisive action of the trial court without granting a motion for a mistrial." *Black v. Commonwealth*, 223 Va. 277, 286, 288 S.E.2d 449, 454 (1982). The trial court must make an initial factual determination, in the light of all the circumstances of the case, whether the defendant's rights had been so indelibly prejudiced as to require a new trial. Unless we can say as a matter of law that this determination was wrong, it will not be disturbed on appeal. Unless the record shows the contrary, it is to be presumed that the jury followed an explicit cautionary instruction promptly given. *See Lewis v. Commonwealth*, 211 Va. 80, 84, 175 S.E.2d 236, 239 (1970).

*LeVasseur v. Commonwealth*, 225 Va. 564, 589, 304 S.E.2d 644, 657 (1983), *cert. denied*, 464 U.S. 1063 (1984). *See also Saun-*

*ders* v. *Commonwealth*, 218 Va. 294, 303, 237 S.E.2d 150, 156 (1977).

■ The officer's testimony that Wise had stated that his victim had only six dollars was merely cumulative. Whittaker had already testified that Wise told her the night of the crimes that "the man had only six dollars" which he had taken "out of the man's pocket." In light of that circumstance, we cannot say as a matter of law that the defendant's rights were so indelibly prejudiced by the questions posed by the Commonwealth's Attorney as to require a mistrial, and we will uphold the trial court's ruling.

Wise also charges that the Commonwealth's Attorney made "an improper and misleading statement of evidence during closing argument." In the course of summation, the Commonwealth's Attorney quoted from a transcript of the testimony of deputy sheriff Symmonds concerning the two wallets found at the time Wise was arrested. Defense counsel objected on the ground that "the wallets were never brought into evidence." On appeal, he argues that the Commonwealth's Attorney "was creating an inference that one of the wallets may have been the victim's".

■ It is immaterial that the wallets were not introduced as exhibits, and we see nothing improper or misleading in the argument. Counsel is always entitled to quote evidence of record in support of an inference he urges the jury to adopt. Whether the inference is justified by the predicate is a question for the jury.

## SUFFICIENCY OF THE EVIDENCE

The trial court erred, Wise insists, in denying his two motions to strike and his motion to set aside the verdict on the ground the evidence was insufficient to prove any of the four offenses with which he was charged.

■ The jury found Wise guilty of grand larceny in the theft of Ricketson's truck. On appeal, he argues that "he was not shown to have been in exclusive possession" of the truck. The defendant did not raise that ground for the trial court's consideration, and he cannot assert it for the first time in this Court. Rule 5:25 (formerly, Rule 5:21); *Ryan* v. *Commonwealth*, 219 Va. 439, 446, 247 S.E.2d 698, 703 (1978).

■ The jury convicted Wise of capital murder for "[t]he willful, deliberate and premeditated killing of any person in the commission of robbery while armed with a deadly weapon." Code § 18.2-31(d). Three witnesses, including Wise's stepmother, testified

that Wise told them on the night of the murder that he had shot a man with a pistol, beat him with a shotgun, and put him in the privy hole. In the course of his several statements, Wise admitted all they had said and, in addition, explained that he had placed his victim, still alive, in the water to hide him from sight, that he had shot into the hole, and that he had acted alone. Except for Wise's inconsistent statements implicating third parties, this evidence stands unimpeached, and we hold that it was fully sufficient to prove that Wise was guilty of willful, deliberate, and premeditated homicide.

Nor does the evidence leave room for any reasonable doubt that Wise robbed his victim while armed with a deadly weapon. Ricketson had $12.00 in his wallet when he left home, and he made two expenditures in Chase City. One of the two wallets seized in the inventory search was empty and Ricketson's driver's license was found in Whittaker's trailer. Finally, in statements made in the presence of several witnesses and in interviews with the police, Wise complained that he had found only $6.00 on the man. It is immaterial whether the wallet was in the victim's pocket or, as Wise said on one occasion, on the dashboard of the truck. Ricketson's personal property was taken with intent to steal from his presence; proof of such a theft, accomplished by violence or intimidation, satisfies the definition of robbery, a common-law crime. *Pritchard* v. *Commonwealth*, 225 Va. 559, 561, 303 S.E.2d 911, 912-13 (1983).

Nevertheless, Wise maintains that the evidence fails to show a nexus between the homicide and the armed robbery as required by the capital murder statute. We disagree. The jury properly could have found that the theft occurred during or sometime after the first shot was fired but before the victim was submerged in the water where he drowned. Even if the wallet was taken from the truck after Ricketson expired, the homicide was a capital offense because "the evidence supports the conclusion that the killing and the theft were interdependent objects of a common criminal design". *Edmonds* v. *Commonwealth*, 229 Va. 303, 310, 329 S.E.2d 807, 813 (1985). *See also Linwood E. Briley* v. *Commonwealth*, 221 Va. 532, 544, 273 S.E.2d 48, 56 (1980), *cert. denied*, 451 U.S. 1031 (1981) (killing following robbery "part of the same criminal enterprise").

## THE PENALTY TRIAL

█ The jury based the death penalty upon the "aggravated battery" leg of the "vileness" predicate. *See* Code § 19.2-264.2. Clearly, the multiple assaults visited upon Ricketson constituted "a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder." *Smith* v. *Commonwealth*, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), *cert. denied*, 441 U.S. 967 (1979).

█ Yet, Wise urges us to commute his sentence because, he claims, it was imposed under the influence of passion or prejudice. *See* Code § 17-110.1(C)(1) and (D)(2). He advances only one argument in support of his claim. The penalty, he contends, was the product of cumulative prejudice resulting from the alleged errors which he believes led to his conviction. "[S]ince we have determined that there was no error in the conduct of the guilt trial or the finding of an aggravated battery, there is no foundation for the defendant's cumulative-effect argument." *Boggs*, 229 Va. at 522, 331 S.E.2d at 422 (citation omitted).

The defendant asks us on brief to hold that the death penalty is excessive "in relation to the crime" of which he was convicted. He cites *Coker* v. *Georgia*, 433 U.S. 584 (1977), where the Supreme Court, observing that "the Eighth Amendment bars . . . punishments . . . that are 'excessive' in relation to the crime committed", *id.* at 592, held that a sentence of death for the crime of rape is cruel and unusual punishment. The *Coker* court also noted, however, that "in *Gregg* [v. *Georgia*, 428 U.S. 153 (1976)] . . . the Court's judgment was that the death penalty for deliberate murder was [not] . . . a punishment grossly disproportionate to the crime." *Id.*

█ The General Assembly has decided that the death penalty for deliberate, premeditated murder in the commission of armed robbery is not disproportionate to the crime unless it is "disproportionate to the penalty imposed in similar cases". Code § 17-110.1(C)(2). In making the comparison mandated by the statute, we focus primarily upon cases in which the supreme penalty was based, as it was here, upon the vileness predicate. Those cases are assembled and annotated in *Jones* v. *Commonwealth*, 228 Va. 427, 450-51 n.3, 323 S.E.2d 554, 567 n.3 (1984), *cert. denied*, 105 S.Ct. 2713 (1985). *See also Washington* v. *Commonwealth, supra; Boggs* v. *Commonwealth, supra.*

We have examined the records in all the capital cases presented to this Court, including those in which a life sentence was imposed, and we find that juries in Virginia generally impose the death penalty for crimes comparable to the crime at bar. *See Stamper* v. *Commonwealth*, 220 Va. 260, 284, 257 S.E.2d 808, 824 (1979), *cert. denied*, 445 U.S. 972 (1980).

Finding no error in the proceedings below, we will affirm the several convictions and uphold the penalties imposed.

*Affirmed.*

## ROBERT M. MUSSELMAN

### V.

## WILLOUGHBY CORPORATION

Record No. 821591

November 27, 1985

Present: Carrico, C.J., Cochran, Poff, Compton, Stephenson, Thomas, JJ., and Gordon, Retired Justice

338

*Paul M. Peatross, Jr.*, for appellant.
*Edward B. Lowry* for appellee.

COMPTON, J., delivered the opinion of the Court.

This is an attorney malpractice case arising from a real estate transaction. The lawyer represented a corporate client and em-

ployed an untrained paralegal who played a significant role in the closing of the transaction.

The relevant facts mainly are undisputed. Appellee Willoughby Corporation, the plaintiff below, was formed in September 1974 by a large number of holders of O'Neill Enterprises, Inc., real estate bonds which had been secured by undeveloped land known as the "Willoughby Tract," lying in the City of Charlottesville and Albemarle County. When O'Neill Enterprises defaulted and went into bankruptcy, the bondholders formed Willoughby Corporation (hereinafter, the Corporation) in order to sell or develop the property to recoup their investments.

Appellant Robert M. Musselman, a defendant below, represented the bondholders in formation of the Corporation. He became attorney for the Corporation and also served as its Secretary. He was not a member of the Board of Directors. The daily operations of the Corporation were handled from defendant's law office by defendant's employees. One director testified that Musselman took "a very dominant role in the affairs of the corporation" and that the Board looked to defendant for "guidance and leadership."

Upon formation of the Corporation, several tracts of land, residential and commercial, were combined. One of the parcels, an 11.5-acre commercial piece known as Parcel 9, is the subject of this controversy.

In 1976, aware that the Board of Directors wished to sell a portion of the Willoughby Tract, defendant contacted Thomas J. Chandler, Jr., a local real estate broker, who obtained an offer to purchase Parcel 9. The offer was made by Charles W. Hurt, a medical doctor who had been a real estate developer in the Charlottesville and Albemarle County area for a number of years.

Initially, Hurt offered to pay $200,000 for the land. The realtor completed a standard form purchase contract dated March 26, 1976 reciting that amount and, as instructed by Hurt, showed the purchaser to be "Charles Wm. Hurt or Assign." The proposal was delivered to defendant who later asked the realtor to attend a special meeting of the Board of Directors, held at Musselman's law office on April 9, 1976.

Among those present at the meeting were the following Board members: Charles J. Frankel, President, a medical doctor who held a law degree; John H. Robinson; and William Massie Smith,

an attorney. Defendant attended along with Chandler and consultants in the fields of finance and real estate.

The Board minutes of the meeting show that Chandler "presented" Hurt's offer to the Board at the meeting and that the Board fully considered "the advantages and disadvantages" of the proposed sale. The Board decided to accept the offer subject to several modifications, to which Hurt later agreed.

Subsequently, another standard form purchase contract for $215,000 was completed dated May 6, 1976. The purchaser was shown to be "Charles Wm. Hurt or Assigns." The contract provided that the purchaser pay $45,000 cash by the time of closing, scheduled for March 1, 1977, and the balance of $170,000 evidenced by a deferred purchase money note secured by a deed of trust, the terms of which were set forth in an addendum attached to the contract. The contract was executed by Hurt, by Musselman on behalf of the Corporation as corporate Secretary, and by the realtor.

The closing did not occur on March 1, 1977. The delay was attributed, in part, to a disagreement between Hurt's attorney and Musselman about the matter of interest on the debt as it related to the availability of sewer service to the property. The delay in closing was a subject of discussion during a meeting of the Board of Directors on September 1, 1977. Directors present at that meeting were Frankel, Clifford C. Fox, and Lloyd T. Smith, Jr., an attorney with extensive experience in real estate matters. Also present were Musselman and one Stanley K. Joynes, III.

Joynes had been employed by Musselman in June 1977. Joynes had just graduated from college but had no formal training either as a lawyer or a paralegal. His main responsibility, under Musselman's direction, was to "shepherd the Willoughby project along." Joynes attended his first Board meeting in July 1977 and was chosen Assistant Secretary of the Corporation.

In the course of the September 1977 Board meeting, defendant was directed to close the Hurt transaction "as soon as possible." Three weeks later, Stuart F. Carwile, Hurt's attorney, notified Musselman by letter dated September 22, 1977 that his client desired to take title to Parcel 9 as follows:

"Stuart F. Carwile and David W. Kudravetz, as trustees for the Fifth Street Land Trust, pursuant to the terms of a certain land trust agreement dated 22 September 1977."

Carwile advised that after Musselman submitted a draft of the deed, Carwile would forward the proposed deed of trust and note for defendant's approval.

The paralegal then prepared the deed, with "some assistance" from other employees of defendant, in accordance with Carwile's request showing the Land Trust as grantee. Joynes arranged for Frankel to execute the deed, dated October 5, 1977, and on that day participated with Carwile in the closing of the transaction. Musselman was out of town on business on both October 4th and 5th. In the course of the closing on October 5th, the paralegal accepted the deed of trust, and other closing documents prepared by Carwile, which specifically exculpated Hurt from personal liability in the transaction as beneficiary under the land trust.

At this point, we note several important undisputed facts. First, the Board of Directors, upon being advised that Hurt, a man of substantial wealth, was to be the purchaser of Parcel 9, intended to rely on Hurt's potential personal liability as a part of the security for payment of the deferred purchase price. Second, Musselman maintained in his trial testimony that he was authorized by the Board to execute the contract of sale on behalf of the Corporation, and this was not contradicted by any witnesses. In addition, Musselman testified that Joynes, the paralegal, represented the Corporation at the closing, acting within his authority as an employee of defendant. Also, none of the Board members, prior to closing, ever examined either the proposed contract of March 26 or the final contract dated May 6. Moreover, no member of the Board knew before closing that the contract showed the purchaser to be "Hurt or Assigns." In addition, Musselman always was of opinion that the foregoing language in the contract authorized Hurt to escape personal liability under the contract by assigning his rights in the contract to whomever he chose. Also, Musselman never called the language to the Board's attention or explained its meaning to the Board. Finally, the fact that the closing documents exculpated Hurt from personal liability as beneficiary under the land trust was never revealed or explained to the Board of Directors prior to closing.

The Board of Directors met on October 6, the day after closing. Directors present were Frankel, Fox, and Lloyd T. Smith, Jr. Joynes and Musselman were also present, among others. The paralegal reported that the sale of Parcel 9 was complete. When a question arose about the date from which interest was to run,

Smith asked to see Musselman's file and discovered that the property had been conveyed to a land trust and not to Hurt. He examined the note, saw that Hurt had not endorsed it, and thought the situation was "just frightening." Smith also examined the other closing documents and saw they specifically provided that Hurt would have no personal liability. Smith next observed the provisions dealing with release of large portions of the property from the lien of the deed of trust upon receipt of the down payment of $45,000 and he was "really concerned." As a result of the discussion at that meeting, "Musselman stated that he would speak with Dr. Hurt and his attorney . . . in an attempt to clear up these problems." The contract of sale was not exhibited to the Board until the following meeting and no discussion had taken place during the October meeting about the "or Assigns" language.

At the next Board meeting held on November 3, 1977, Lloyd T. Smith and Musselman engaged in a discussion about the effect of the "or Assigns" language. Smith was of opinion, contrary to defendant's view, that use of the term should not permit Hurt to avoid personal liability to the Corporation. According to the minutes, "Mr. Musselman promised to have further research conducted on the question." At this time, the evidence showed, the Board was not overly concerned about the situation. The property had not been released, even though the down payment had been received, and the Board felt it had some bargaining leverage with Hurt.

Two days after the November meeting, Musselman wrote Hurt's attorney in an attempt to resolve the problems that had arisen about the transaction. In the course of the letter, Musselman discussed the "or Assigns" dispute between Board member Smith and Musselman. Defendant asked Hurt's lawyer for reference to "any Virginia authority" bearing on the question, which would support Musselman's view that Hurt could not be held personally liable.

At the Board meeting held on January 26, 1978, Musselman reported that he had negotiated a favorable change in the interest terms on the note. But the Board learned for the first time that Musselman had recorded the deed releasing three front parcels from the tract in question. The deed of partial release was executed by Frankel on the day of closing and by Musselman as a trustee on January 18, 1978, and recorded that day. Musselman

was of the belief that as a trustee under the deed of trust, once the release provisions had been complied with by the purchaser, Musselman had no right to refuse to record the deed of partial release. Upon learning of this development, Smith testified that he was "astonished."

The Land Trust defaulted under the terms of the $170,000 note in respect to an interest payment due on April 1, 1978. Subsequently, this action to recover the principal sum, plus interest, due under the real estate transaction was filed in September 1978 in numerous counts against Hurt and Musselman. The proceeding against Hurt was severed and he was eventually dismissed by the trial court as a party defendant.

The Corporation's action against Musselman was based on alternative theories. The plaintiff charged that defendant breached certain fiduciary duties in his capacity as an officer of the Corporation. In addition, the Corporation alleged that Musselman, in his capacity as attorney for the Corporation was negligent and breached his fiduciary duty as counsel to the Corporation.

At the March 1982 trial, the jury was permitted, under the instructions, to find against defendant in his capacity either as attorney, or as an officer of the Corporation, or as both attorney and officer. The jury found against defendant in his capacity as attorney only and fixed the damages, which were not in dispute, at $243,722.99. This sum represented the principal amount due on the obligation, plus interest through the last day of trial. The trial court entered judgment on the verdict in June 1982, and we awarded defendant this appeal in July 1983.

On appeal, defendant understandably does not seriously contend that the evidence was insufficient to raise a jury question on the issue of negligence and breach of fiduciary duty in his capacity as an attorney. Under the circumstances, Musselman had a duty to disclose anything known to him which might affect his client's decision "whether or how to act." *Owen* v. *Shelton*, 221 Va. 1051, 1054, 277 S.E.2d 189, 191 (1981) (applying the rule in the case of a real estate broker). *See Allen Realty* v. *Holbert*, 227 Va. 441, 446-47, 318 S.E.2d 592, 595 (1984) (applying the rule in the case of accountants). And, contrary to defendant's assertion, a lawyer is not relieved of such duty owed to a corporate client merely because some members of the board of directors are attorneys. Of course, an attorney acting as counsel for a corporate client is not required to explain to the board of directors every sen-

tence in a standard form land contract. But the attorney has a duty to disclose information necessary to enable the client to understand those contract provisions that have the potential for affecting the client adversely.

In the present case, the evidence showed that defendant failed to advise the Board before closing that the crucial "or Assigns" language was in the contract, and failed to explain the legal effect of the language when, in defendant's opinion, use of the language enabled Hurt to escape personal liability, a consideration of prime importance to the Board in view of the manner in which the deal was structured. In addition, the evidence demonstrated that Musselman permitted an untrained paralegal to accept formulation of final documents that further exculpated Hurt, without bringing such documents to the Board for approval. In sum, the evidence was sufficient to support the jury's finding that defendant breached his duty as an attorney to adequately inform his client and that such breach was a proximate cause of plaintiff's loss.

Inexplicably, defendant's main contentions on appeal are based on the faulty premise that he lacked corporate authority to act in executing the contract containing the "or Assigns" language and in completing the conveyance to a land trust, while, in the process, exculpating Hurt from personal liability. This argument is totally inconsistent with defendant's trial testimony that he did, in fact, have authority to execute the contract. It is also at odds with the uncontroverted evidence about defendant's "dominant role" in acting for the Corporation. This idea relies on the following circular reasoning: Even though specifically empowered to execute the contract, defendant had no authority to permit conveyance to a land trust, because the Board of Directors was unaware of the crucial contract provisions, which Musselman had the duty to disclose to the Board in his capacity as attorney. Building on this infirm basis, defendant contends that the Board should immediately have rescinded the transaction upon discovery of the "problem" at the meeting the day after closing and, in failing to rescind, the Corporation should be deemed to have ratified Musselman's unauthorized acts. As a part of this argument, defendant complains that the trial court misdirected the jury because it granted instructions which failed to recognize this theory and refused to grant tendered instructions which would have permitted the jury to consider the issue of ratification.

There is no merit to this argument. Musselman, being authorized to execute the contract and to close the transaction, had the responsibility as counsel to advise his client, immediately upon discovery of the "problem," that it should attempt to rescind the transaction, if we assume an attempt at rescission would have been successful. Instead, defendant at no time advised the Board of Directors that it should pursue rescission. At the meeting on October 6, the day after closing, Musselman merely stated that he would "attempt to clear up these problems" by speaking with Hurt and his attorney. At the next Board meeting, Musselman only promised to perform further research on the "or Assigns" question. All the while, the Board justifiably expected that the transaction would be satisfactorily completed and that Hurt would consent to become personally bound in the event of default. Finally, in January of 1978, the Board's position was made even worse when three parcels in the tract were released as the result of the recording of the deed of partial release. If Musselman did not realize the Corporation may have had the right to rescind, he will not be heard to complain that the Board should have realized it on its own. And if he knew the Board may have had the right to rescind, he will not be permitted to have withheld such advice from the Board members and then contend they have ratified his conduct by not rescinding on their own. Therefore, the trial court properly ruled the theory of ratification was not applicable and that defendant was not entitled, under the circumstances, to have that issue submitted to the jury.*

For these reasons, the judgment of the trial court will be

*Affirmed.*

---

\* There is no merit to defendant's assignment of error which asserts the trial court erred in refusing defendant's exhibit 9, an August 1978 letter from Hurt to plaintiff's Board of Directors offering to "unwind" the transaction upon return of the payment of $45,000. In addition, this issue was not mentioned during oral argument of the appeal. Also, the record fails to show the exhibit was refused or that the jury was told to disregard it. Rather, the record affirmatively shows the exhibit was admitted in evidence.

The letter was received in evidence over plaintiff's objection during the second day of trial. Appendix at 200. Later, the exhibit was discussed again and, upon plaintiff's further objection, the trial court said the letter was irrelevant and indicated it would "so instruct the jury later on." Appendix at 314. The record on appeal does not disclose that thereafter the jury was ever told to disregard the letter. Indeed, the letter is among the admitted exhibits in the record and is initialled by the trial judge, a further indication that the exhibit was not excluded.

JIMMY DALE LOWE

V.

COMMONWEALTH OF VIRGINIA

Record No. 841618

November 27, 1985

Present: All the Justices

*Robert H. Blodinger (Craig G. Van de Castle*, on brief), for appellant.

*Marla Lynn Graff, Assistant Attorney General (William G. Broaddus, Attorney General*, on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

The question for decision in this criminal case is the legality of a roadblock established for the purpose of checking the sobriety of motor vehicle operators.

On Saturday, January 28, 1984, at 1:55 a.m., defendant Jimmy Dale Lowe was operating a motor vehicle south on Avon Street across a bridge in the City of Charlottesville. The city police had established a roadblock at the south end of the bridge about three hours earlier. The roadblock was announced to motorists by a sign, stating "License and Sobriety Checkpoint, Prepare to Stop," located on the crest of the bridge facing southbound traffic.

After crossing the bridge, defendant proceeded into the roadblock and stopped where city police patrolman Lawrence B. Brown was standing. Brown had not observed defendant drive erratically nor was there any other indication that defendant was driving while intoxicated. Brown asked for defendant's operator's license, which defendant handed to Brown. While talking to defendant to verify his address, the officer noticed defendant's eyes "were very red" and Brown smelled the odor of alcohol about defendant's person. The officer directed defendant to drive his vehicle "around the corner off of the bridge" to enable other vehicles

to come to the checkpoint. The officer next asked defendant to step out of his vehicle and to perform three dexterity tests, which defendant failed. Defendant then was arrested for driving under the influence of alcohol (DUI). *See* Code § 18.2-266. He elected to have his breath analyzed. A police van was located at the scene for the purpose of administering such tests. The test showed that defendant's blood alcohol content was .17, an amount which raises a presumption of intoxication. *See* Code § 18.2-269.

Defendant was convicted of the charge in the general district court and he appealed to the circuit court. Prior to trial in the circuit court, defendant filed a motion to suppress all evidence derived from the stopping of his vehicle on the ground that his constitutionally protected right against unreasonable seizures was violated. Sitting without a jury, the circuit court heard the evidence on the motion together with evidence on the merits of the case. The court denied the motion and found defendant guilty as charged, giving rise to this appeal.

Specifically, the issue before us is whether the seizure of defendant under the circumstances of this roadblock was unreasonable under the Fourth and Fourteenth Amendments to the United States Constitution, and art. I, § 10 of the Constitution of Virginia.[1]

---

[1] The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Local law enforcement personnel are subject to the requirements of the Fourth Amendment under the due process clause of the Fourteenth Amendment. *Mapp v. Ohio,* 367 U.S. 643, 655 (1961).

Article I, § 10 of the Virginia Constitution provides:

"That general warrants, whereby an officer or messenger may be commanded to search suspected places without evidence of a fact committed, or to seize any person or persons not named, or whose offense is not particularly described and supported by evidence, are grievous and oppressive, and ought not to be granted."

The Virginia requirements, under our constitution and the statutes implementing the constitutional provision, are "substantially the same as those contained in the Fourth Amendment." A. Howard, I *Commentaries on the Constitution of Virginia* 182 (1974). *See Tri-Pharmacy, Inc.* v. *United States,* 203 Va. 723, 728, 127 S.E.2d 89, 92 (1962), *cert. denied,* 371 U.S. 962 (1963); *Zimmerman* v. *Town of Bedford,* 134 Va. 787, 801-02, 115 S.E. 362, 366 (1922). The Fourth Amendment is but declaratory of the common law on the subject. *McClannan* v. *Chaplain,* 136 Va. 1, 14, 116 S.E. 495, 498-500 (1928). Thus, we will focus on the Fourth Amendment in discussion of the issue presented.

■ The applicable constitutional provisions protect, of course, only expectations of privacy that are reasonable. *Katz* v. *United States*, 389 U.S. 347, 351-53 (1967). Nevertheless, a person "operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation." *Delaware* v. *Prouse*, 440 U.S. 648, 662 (1979). And stopping a motor vehicle and detaining the operator constitute a "seizure" within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention is quite brief. *Leeth* v. *Commonwealth*, 223 Va. 335, 340, 288 S.E.2d 475, 478 (1982), citing *Prouse*, 440 U.S. at 653. Therefore, the pertinent inquiry here is whether defendant's detention, when he was stopped at the initial checkpoint at the south end of the bridge, was constitutionally unreasonable.

During the last decade, the Supreme Court of the United States has decided four cases which impact the constitutional validity of roadblock stops of vehicles. *United States* v. *Brignoni-Ponce*, 422 U.S. 873 (1975) (random stops of vehicles near Mexican border to detect entry of illegal aliens ruled invalid); *United States* v. *Martinez-Fuerte*, 428 U.S. 543 (1976) (permanent checkpoint stops to stem flow of illegal alien traffic from Mexico approved); *Delaware* v. *Prouse, supra*; and *Brown* v. *Texas*, 443 U.S. 47 (1979). Although the Court has not ruled directly on the validity of roadblock seizures employed to detect drunk drivers, it has fixed definite limitations on the right of police to maintain roadblocks under the Fourth Amendment. Basically, law enforcement personnel may not stop motorists in a wholly random and discretionary manner unless there is, at least, articulable and reasonable suspicion either that the operator is unlicensed, the vehicle is unregistered, or the operator or other occupant is subject to seizure for violation of law. The Court in *Prouse*, however, in striking down a random, discretionary stop made to check license and registration, said in dicta:

"This holding does not preclude the . . . States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative. We hold only that persons in automobiles on public roadways may not for that reason

alone have their travel and privacy interfered with at the unbridled discretion of police officers." 440 U.S. at 663.

*Cf.* Virginia Code § 46.1-7(c) (requiring operators of vehicles to stop upon command of a police officer to exhibit drivers' licenses). ■ Subsequently, the Court in *Brown* v. *Texas, supra,* stated that the reasonableness of seizures, less intrusive than traditional arrests, depends on a balancing test. In declaring the application of a Texas stop-and-identify statute unconstitutional, the Court set forth three criteria by which the validity of such seizures should be gauged. There must be a weighing of (1) the gravity of the public concerns served by the seizure, (2) the degree to which the seizure advances the public interest, and (3) the severity of the interference with individual liberty. 443 U.S. at 50-51. The Court, in *Brown,* noted that a "central concern" in balancing the foregoing competing considerations has been to make certain that "an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." *Id.* at 51. Thus, the Court said, "the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *Id.*

■ The evidence in this case shows that defendant was not stopped because the police suspected that a crime had been, was being, or was about to be committed. Consequently, we must examine the city's plan for maintaining this DUI roadblock to determine whether defendant was stopped pursuant to a practice embodying neutral criteria.[2]

---

[2] The public interest in eliminating the drunken driver from the highways is overwhelming. "The carnage caused by drunk drivers is well documented and needs no detailed recitation here." *South Dakota* v. *Neville,* 459 U.S. 553, 558 (1983). But a number of state courts have determined that roadblocks used by police to detect drunk drivers run afoul of the Fourth Amendment, while other jurisdictions have found that such roadblocks do not offend the constitutional provisions.

For state cases finding such roadblocks invalid, see *Jones* v. *State,* 459 So.2d 1068 (Fla. Dist. Ct. App. 1984); *People* v. *Bartley,* 125 Ill. App.3d 575, 466 N.E.2d 346 (1984); *State* v. *McLaughlin,* 471 N.E.2d 1125 (Ind. Ct. App. 1984); *State* v. *Koppel,* 499 A.2d 977 (N.H. 1985); *State* v. *Smith,* 674 P.2d 562 (Okla. Crim. App. 1984); *State* v. *Olgaard,* 248 N.W.2d 392 (S.D. 1976); *Webb* v. *State,* 695 S.W.2d 676 (Tex. Ct. App. 1985).

---

For state cases approving DUI roadblocks, see *State* v. *Super. Ct. In & For County of Pima*, 691 P.2d 1073 (Ariz. 1984); *People* v. *Conway*, 135 Ill. App.3d 887, 482 N.E.2d 437 (1985); *State* v. *Garcia*, 481 N.E.2d 148 (Ind. Ct. App. 1985); *State* v. *Deskins*, 673 P.2d 1174 (Kan. 1983); *Little* v. *State*, 300 Md. 485, 479 A.2d 903 (1984); *Commonwealth* v. *Trumble*, 396 Mass. 81, 483 N.E.2d 1102 (1985); *State* v. *Coccomo*, 177 N.J. Super. 575, 427 A.2d 131 (1980); *People* v. *Scott*, 473 N.E.2d 1, 63 N.Y.2d 518, 483 N.Y.S.2d 649 (1984); *State* v. *Martin*, 496 A.2d 442 (Vt. 1985).