Ronald Lee HOKE, Sr., Petitioner–Appellee,

v.

J.D. NETHERLAND, Warden, Respondent–Appellant.

Ronald Lee HOKE, Sr., Petitioner–Appellant,

v.

J.D. NETHERLAND, Warden, Respondent–Appellee.

Nos. 95–4012, 95–4013.

United States Court of Appeals, Fourth Circuit.

Argued June 3, 1996.

Decided Aug. 22, 1996.

**ARGUED:** Pamela Anne Rumpz, Assistant Attorney General, Office of Attorney General, Richmond, Virginia, for Appellant. Gerald Thomas Zerkin, Gerald T. Zerkin & Associates, Richmond, Virginia, for Appellee. **ON BRIEF:** James S. Gilmore, III, Attorney General of Virginia, Office of Attorney General, Richmond, Virginia, for Appellant. Donald R. Lee, Virginia Capital Representation Resource Center, Richmond, Virginia; Brian F. Kenney, Miles & Stockbridge, P.C., Fairfax, Virginia, for Appellee.

Before RUSSELL, HALL, and LUTTIG, Circuit Judges.

Reversed by published opinion. Judge LUTTIG wrote the majority opinion, in which Judge RUSSELL joined. Judge HALL wrote a dissenting opinion.

## OPINION

LUTTIG, Circuit Judge:

Petitioner, Ronald Lee Hoke, Sr., was convicted in 1986 of capital murder in the robbery, rape, and abduction of Virginia C. Stell. The United States District Court for the Eastern District of Virginia granted Hoke's writ of *habeas corpus,* vacated his death sentence, and remanded for a new trial. For the reasons that follow, we reverse and remand with instructions to reinstate Hoke's death sentence.

### I.

On October 15, 1985, at 3:25 a.m., Hoke flagged down a police officer in Hagerstown, Maryland, and confessed to murdering Virginia C. Stell some ten days earlier in her apartment in Petersburg, Virginia. Later that day, Hoke repeated his confession to members of the Petersburg, Virginia, police force. Two days later, while in the Petersburg jail, Hoke contacted the Petersburg police and, for the third time, confessed to murdering Stell.

On October 4 or 5, 1985, Hoke and Stell were both at the European Restaurant in Petersburg, Virginia. Stell arrived first, but Hoke later joined her at her table. At about 6:00 p.m., the two departed the restaurant together.

On October 7, 1985, police discovered Stell's body in the bedroom of her apartment. She was bound and gagged, and lying on her stomach, dead. Her wrists were bound with a blue electrical cord, which had been removed from an electric clothes iron. Her ankles were bound with a brown electrical extension cord. Her mouth was gagged with a pair of panties, which were tied around her head so tightly that they left an "impression" on her face. J.A. at 144. And her anal ring was dilated and smeared with both stool and a greasy, yellow substance, "like margarine or butter." J.A. at 149.

Stell had been stabbed twice, once in the upper right front quadrant of her body and a second time in the right side of her back. The frontal wound was six-and-one-half

inches deep, and the back wound was two-and-five-eighths inches deep. J.A. at 153–54. Additionally, there were fresh, red bruises on her arms. J.A. 150–51. The medical examiner opined that Stell had survived "at least several minutes" after being stabbed. J.A. at 152.

In Stell's bedroom, the police found a knife, covered with blood, laying on an ironing board. J.A. at 181. The blood on the knife matched Stell's blood type. J.A. at 167–68. Also on the ironing board was an iron, the cord from which had been removed and used to bind Stell's wrists. J.A. at 182. Several dresser drawers were open and their contents were "dumped" on the bedroom floor. J.A. at 188, 190. Items from two purses—including · empty pill containers—were also strewn upon the bedroom and adjacent dining room and kitchen floors. J.A. at 187–88, 190. The smoke detector had been ripped from the ceiling socket. J.A. at 181.

Swabs and smears were taken from Stell's anus and vagina and tested in a laboratory for the presence of semen. The laboratory identified semen "on the vaginal swabs and smear, on the anal smear," and on a "towel labelled 'peri-anal wipings.'" J.A. at 162–63. Semen found on the sheets and bedspread in the bedroom was consistent with Hoke's blood type. J.A. at 165.

In Hoke's first confession, on October 15, he told the Hagerstown police that he had met a woman named Virginia Stell at the European Restaurant, and that he and the woman had gone to her apartment. He said that he had then murdered her by stabbing her twice, "once in the back, once in the abdomen area in the front." J.A. at 195. After he had stabbed her, "she was screaming," so he had "placed a pillow . . . over her face to muffle [the] screaming." J.A. at 196. Hoke said that he had known the woman was dead before he left the apartment "because she wasn't breathing, she wasn't moving, and her eyes were rolled back in her head." *Id.* Finally, Hoke said that he had "dumped [Stell's] purse and [taken] some pills and left" the apartment. *Id.*

In Hoke's second confession on that same day, he told the Petersburg police that, after arriving at Stell's apartment, the two of them had "had sex." J.A. at 207. Then, he had "put [a knife] to her throat and tied her up, gagging her mouth, tying her hands, tying her feet together." *Id.* He said that he had then stabbed her in the back with the knife, muffling her screams with a pillow, and rolled her over and stabbed her in the stomach. As Stell continued to scream, Hoke had "held the pillow over her face for between four and five minutes in an attempt to suffocate her," until she died. J.A. at 208. He had then ransacked her apartment and stole some medication that was in Stell's purse. *Id.*

On October 17, while in the Petersburg jail, Hoke contacted the police and confessed for a third time. On this occasion, he told police that he had decided to kill Stell while they were walking to her apartment, adding that he had thought about killing someone for a long time, and "this seemed like a perfect opportunity" to do it. J.A. at 209.

On August 5, 1986, Hoke was tried before a jury in the Circuit Court of the City of Petersburg. The jury found Hoke guilty of capital murder in the commission of robbery, rape, and abduction. Concluding that Hoke "constitute[d] a continuing serious threat to society" or that his crime was "outrageously or wantonly vile, horrible or inhuman in that it involved torture or depravity of mind or aggravated battery to the victim," the jury "unanimously fix[ed] [Hoke's] punishment at death." J.A. at 395–396.

The Virginia Supreme Court thereafter affirmed Hoke's conviction and sentence on March 3, 1989, *Hoke v. Commonwealth*, 237 Va. 303, 377 S.E.2d 595, 597–600 (1989), and the United States Supreme Court denied *certiorari*, 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 709 (1989).

On March 13, 1990, Hoke filed his first state *habeas* petition in the City of Petersburg Circuit Court. Following an evidentiary hearing, the petition was denied. J.A. at 674. The Virginia Supreme Court subsequently denied Hoke's petition for appeal and his petition for rehearing, and the United States Supreme Court denied Hoke's second petition for a writ of *certiorari. Hoke v.*

*Thompson,* 502 U.S. 880, 112 S.Ct. 228, 116 L.Ed.2d 185 (1991).

On April 29, 1991, Hoke filed his second state *habeas* petition in the City of Petersburg Circuit Court. It, too, was dismissed, J.A. at 705, and the Virginia Supreme Court again refused Hoke's petition for appeal.

In January 1992, Hoke filed the present federal *habeas* petition pursuant to 28 U.S.C. § 2254. Initially, the district court dismissed the petition, denying Hoke's request for an evidentiary hearing. *Hoke v. Thompson,* 852 F.Supp. 1310 (E.D.Va.1994). In August 1994, however, the district court vacated its earlier decision and ordered a hearing on an issue different from those presented on this appeal.

Prior to that hearing, which was held in November 1994, and in connection with the matter to be addressed at that hearing, the district court ordered the Commonwealth to produce the prosecution's file from the state court proceedings. In response, the Commonwealth offered, and the district court received, the Petersburg Police Department Files. These files included witness interviews with three men—James Henry Jones, Lowell Eastes, and Dale Griesert—who claimed they had previously had sex with Stell. J.A. at 796–99, 804–05. In these interviews, Jones and Eastes each claimed that he had previously had vaginal sex with Stell. Griesert, who stated that he had not seen Stell for almost a year, said that he and Stell had had vaginal sex together and that on one occasion they had also engaged in anal sex. Griesert stated that the anal sex had been at Stell's behest, and that she had provided Vaseline as a lubricant.

On the basis of these interviews, the district court permitted Hoke to amend his petition to add, for the first time, a claim that the prosecution had withheld exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The district court also allowed Hoke to add to his petition a separate claim that the prosecution had knowingly suborned perjured testimony in violation of *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), when it presented at trial the testimony of Hoke's fellow inmate, Emmett Sallis. The district court thereafter concluded that neither of the newly-added claims was procedurally barred, and that with respect to both, Hoke had established that his rights had been violated. Reasoning that the *Brady* violation rendered invalid Hoke's predicate rape conviction and that the *Napue* violation rendered invalid both Hoke's predicate robbery and abduction convictions, the court granted the writ of *habeas corpus.*

From the district court's ensuing order of a new trial, the Commonwealth appeals, arguing that none of Hoke's predicate offenses of rape, robbery, and abduction (any one of which is sufficient to sustain Hoke's capital murder conviction) is subject to constitutional challenge.

## II.

The Commonwealth contends first that the district court erred in holding that the state violated Hoke's due process rights under *Brady* by failing to disclose the interviews with Jones, Eastes, and Griesert. We agree.[1]

---

1. The Commonwealth also argues that the district court erred in holding that Hoke was not procedurally barred from raising his *Brady* claim. The district court held that Hoke had not defaulted the *Brady* claim, but, even if he had defaulted this claim, there was cause and prejudice sufficient to justify consideration of the claim by the federal courts. For the same reasons that we conclude Hoke likely would have discovered the three witnesses whose identities he contends were wrongfully withheld from him, as well as their relationship with Stell, if he had undertaken a reasonable and diligent investigation, we seriously doubt whether the district court was correct in either of these holdings.

Under Virginia Code § 8.01–654(B)(2), a petitioner is barred from raising any claim in a successive petition if the facts as to that claim were either known "or available" to petitioner at the time of his original petition. *Cf. Barnes v. Thompson,* 58 F.3d 971, 974 (4th Cir.1995) (A "section 8.01–654(B)(2) default determination by the Commonwealth's highest court reflects a finding that 'all of the facts on which the current petition was based were either known or available to petitioner.'") (quoting *Waye v. Murray,* 884 F.2d 765, 766 (4th Cir.1989), *cert. denied,* 492 U.S. 936, 110 S.Ct. 29, 106 L.Ed.2d 634 (1989)), *cert. denied,* —— U.S. ——, 116 S.Ct. 435, 133 L.Ed.2d 350 (1995). Because it appears that the information, the withholding of which Hoke

## A.

██ Under *Brady v. Maryland,* the "[s]uppression of exculpatory evidence by the Government that is material to the outcome of a trial" is violative of the Due Process Clause of the Constitution. *United States v. Kelly,* 35 F.3d 929, 936 (4th Cir.1994). The strictures of *Brady* are not violated, however, if the information allegedly withheld by the prosecution was reasonably available to the defendant. As we held in *United States v. Wilson,* "where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine." 901 F.2d 378, 381 (4th Cir.1990) (citation omitted). Here, there is little doubt that had Hoke undertaken a "reasonable and diligent" investigation, he would have learned of Jones, Eastes, Griesert, and their relationships with Stell.

As Hoke's attorney's testimony in the federal evidentiary hearing confirms, Hoke believed from the outset of the case that evidence of Stell's prior consensual sexual relationships could be important to establishing at trial that Stell had consented to having sex with him on the night of the murder. *See* J.A. at 1189–90 (testimony of John Maclin). Notwithstanding the recognized importance of such evidence, Hoke undertook what at best could be termed a limited investigation into Stell's prior relationships and sexual history. The entirety of that investigation entailed perhaps as few as two, and no more than four, visits to the European Restaurant by Hoke's attorney, during which he interviewed as few as five, and no more than seven, people. J.A. at 1181–82, 1189, 1191–93. Insofar as appears from the record before us, Hoke never even attempted to contact any of Stell's friends or acquaintances who were not patrons of

the European Restaurant, or to visit other restaurants, bars, or business establishments frequented by Stell. Indeed, there is no evidence that Hoke's attorney even attempted to learn about Stell's relationships from her neighbors and friends in the apartment complex, some of the first persons an attorney would reasonably be expected to contact in a case such as this. When Hoke's attorney was asked why he did not interview additional persons beyond the five to seven he interviewed at the European Restaurant, or why he did not conduct further investigation into Stell's sexual relations, his only reply was that, "I would have probably run out of names or run out of people other than just standing at the European Lunch.... [A]t that point I didn't have anybody else other than standing on the street corner asking." J.A. at 1191–92.

While it cannot be known with absolute certainty, it is quite likely that, had Hoke undertaken a reasonable investigation, he would have learned of all three of the men in question and of their relations with Stell. In fact, the police themselves learned of these men either from sources with whom Hoke's attorney spoke or from persons readily accessible to Hoke, a fact apparently not considered by the district court. For example, although Hoke contends that "Dale Griesert[] was discovered as a result of unspecified police investigation," Appellee's Br. at 23, the police actually learned of Griesert in an interview with Freda Sarvis, the owner of the European Restaurant, J.A. at 794, who was interviewed by Hoke's attorney. J.A. at 1192.[2]

As even Hoke concedes, both Eastes and Jones were of lesser significance than Griesert. *See* Appellee's Br. at 23. But these men also could easily have been found by Hoke. The police learned that Stell "was

contends entitles him to relief, was available to Hoke, it is quite likely that he in fact did default his *Brady* claim by not presenting that claim in his initial state *habeas* proceeding. Of course, the ready availability of that information would likewise prevent him from establishing "cause" for that default such as to enable him to overcome this procedural bar in federal court.

2. Sarvis told the police that Stell "had mentioned a male named 'Dale' to [her] in the past and ... that 'Dale' was married." J.A. at 794. Hoke nowhere asserts that Sarvis did not tell his attorney what she told the police, an assertion that we would have expected had she not also told the attorney about "Dale." It may well be, therefore, that Hoke's attorney simply did not pursue the information provided by Sarvis.

seeing" Lowell Eastes and that Eastes was employed with Century 21 Realty, in an interview with Ruby Yokem, a waitress at the European Restaurant. J.A. at 780. As Hoke notes, Appellee's Br. at 3, the police initially learned of James Henry Jones when they found his identification card in Stell's apartment; but Freda Sarvis, with whom Hoke's attorney spoke, also knew of Jones, as evidenced by her statement to police. *See* J.A. at 795.

Hoke suggests that it is unlikely any of these individuals would have spoken with his counsel about their relationships with Stell. In support of this suggestion, Hoke notes that Eastes was initially "reluctant" to speak with the police about his relationship with Stell, *see* J.A. at 796, and that Griesert similarly had to be "pressed" by police for details of his relationship with Stell, *see* J.A. at 798. However, as Hoke's attorney testified, *see* J.A. at 1189–90, he himself believed that people would be willing to speak about their prior relationships with Stell, and we are unwilling simply to assume otherwise on the record before us. *See, e.g., United States v. Meros*, 866 F.2d 1304, 1308 (11th Cir.1989) ("To establish a *Brady* violation a defendant must prove ... that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence ...").

We are confident, therefore, that a "reasonable and diligent" investigation would have led Hoke to Griesert, Eastes, and Jones, and we reject Hoke's hyperbolic assertion that this is tantamount to saying that "anything in the physical world, and perhaps the metaphysical, is available to the defense," Appellee's Br. at 23. Even assuming, however, that Hoke's attorney could not have learned of these men through reasonable efforts, or that, if identified, they would not have spoken with him, Hoke's *Brady* claim is still meritless, as we discuss below, because the allegedly withheld witness statements were not "material" to Hoke's prosecution.

### B.

■ Under *Brady v. Maryland*, it is only the suppression of "material" exculpatory evidence by the government that violates a defendant's due process rights. *See, e.g., United States v. Kelly*, 35 F.3d 929, 936 (4th Cir.1994) (citing *Brady*, 373 U.S. at 83, 87, 83 S.Ct. at 1194, 1196–97); *see also Kyles v. Whitley*, —— U.S. ——, ——, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995). Evidence is "material" "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). "A 'reasonable probability' of a different result is[ ] shown when the Government's evidentiary suppression *'undermines confidence in the outcome of the trial'.*" *Kyles*, —— U.S. at ——, 115 S.Ct. at 1566 (emphasis added) (internal citations omitted).

The district court held that the prosecution's failure to produce the statements of Griesert, Eastes, and Jones rendered Hoke's predicate rape conviction invalid under *Brady*, because these statements "cast[ ] into serious doubt the Commonwealth's theory that the sexual encounter between Stell and Petitioner was non-consensual." J.A. at 1285–86. Even assuming that these statements would have been admissible at Hoke's trial,[3] the district court plainly erred in this conclusion.

■ We are at a loss to understand how the statements of Eastes and Jones could even possibly be considered "material." Eastes and Jones merely stated that they had had normal sexual intercourse with Stell

---

3. As even Hoke's counsel acknowledged, J.A. at 1191, these statements may well have been inadmissible at trial under Virginia's Rape Shield Statute, and therefore, as a matter of law, "immaterial" for *Brady* purposes. *See Wood v. Bartholomew*, —— U.S. ——, ——, 116 S.Ct. 7, 10, 133 L.Ed.2d 1 (1995). Virginia's Rape Shield Statute prohibits "evidence of specific instances of [a complaining witness's] prior sexual conduct" unless it fits into one of three narrow

exceptions. Code of Virginia § 18.2–67.7. The only arguably relevant exception permits the admission of evidence "offered to provide an alternative explanation for physical evidence of the offense charged." *Id.* This exception, however, is "limited to evidence designed to explain the presence of semen, pregnancy, disease, or physical injury to the complaining witness's intimate parts," *id.,* an exception that would not be satisfied by the evidence at issue here.

previously and on only several occasions.[4] Eastes stated "that he [had seen] the victim 4–5 times total in a period of approx[imately] 5 months, . . . that the couple [had] engaged in vaginal sex only [and] that 'kinky' sex was never brought up by either party." J.A. at 797. Jones, also noting that "no 'kinky stuff' occurred," stated that he had only "had [vaginal] sexual intercourse [with Stell] on *one* occasion." J.A. at 805 (emphasis added). That Stell, a 56–year–old, single woman, had previously had sexual intercourse with Eastes and Jones, is arguably altogether irrelevant, but at the very least is not material, to whether she consented to have sex with Hoke on the night of the murder. There is, in our judgment, no chance at all that the outcome of Hoke's capital murder trial would have been different had the defense known of these prior incidents of sexual intimacy.

■ Griesert's statement that, almost one year before the murder, he and Stell had engaged in anal sex at her behest, J.A. at 799, is at least arguably more relevant, inferentially, to whether Stell consented to the vaginal sex (as well as to the anal sex) with Hoke on the night of her murder. Nevertheless, we are convinced beyond any doubt that, in light of the overwhelming evidence that Stell was raped by Hoke, no reasonable juror would conclude that this single act of anal intercourse almost a year earlier was *material* to the question of whether Stell consented to having sex with Hoke.

This is a far cry from a case where there is no independent corroborating evidence of rape, and it is the word of one against the word of another as to whether the act of intercourse was consensual. When Stell was found, she had been stabbed to death, her hands and feet were bound, and her mouth was gagged. J.A. at 147, 182. Her wrists were bound with "a blue electrical cord" which had been torn from a clothes iron, her ankles were bound with a brown electrical extension cord, and her mouth was gagged with a pair of panties. J.A. at 182. The panties were tied so tightly that they left an "impression" on her face. J.A. at 144. Additionally, there were numerous contusions on her arms, J.A. at 150–51, evidencing that a struggle had preceded her stabbing.[5] And, significantly, Stell was actually found murdered, bound, and gagged in the position in which she was sodomized, *see* J.A. at 154, 188, which was confirmed by the medical examiner's testimony that no semen had dripped from Stell's anus and the margarine pattern on her anus was undisturbed. J.A. at 1200–01, 1209, 1212, 1216.[6] That marga-

---

4. The federal courts, for example, hold such evidence either wholly irrelevant to the issue of consent, *see Jones v. Goodwin*, 982 F.2d 464, 471 (11th Cir.1993) ("[A] woman's consensual sexual activities with certain individuals in no way imply consent to similar activities with others."); *Cruz–Sanchez v. Rivera–Cordero*, 835 F.2d 947, 949 (1st Cir.1987) ("Under Federal Rule of Evidence 412, evidence of a victim's past sexual behavior is, except for very narrowly defined purposes, irrelevant to a charge of rape."); *Jeffries v. Nix*, 912 F.2d 982, 987 (8th Cir.1990) (" 'It is obvious that the mere fact of unchastity of a [rape] victim has no relevance whatsoever to her credibility as a witness.' ") (internal citations omitted), *cert. denied*, 499 U.S. 927, 111 S.Ct. 1327, 113 L.Ed.2d 259 (1991), or of such low probative value as to be outweighed by its prejudicial effect, *see United States v. Kasto*, 584 F.2d 268, 271–72 (8th Cir.1978) ("[E]vidence of a rape victim's unchastity, whether in the form of testimony concerning her general reputation or ... testimony concerning specific acts with persons other than the defendant, is ordinarily insufficiently probative ... of her consent to intercourse with the defendant on the particular occasion charged to outweigh its highly prejudicial

effect."), *cert. denied*, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979).

5. The medical examiner who conducted the autopsy on Stell testified at trial as follows:

> She had red bruises [on] her forearms. She had two inside the left wrist and one to the right forearm or closer to the middle, to the joint, and one [on] the upper arm on the right. These were red and they were fresh and when I put an incision in them, there was red blood in the soft tissue underneath.

J.A. at 150–51.

6. Hoke argues that the state medical examiner's testimony from the *habeas* evidentiary hearing that there were no drippings from Stell's anus and that the margarine around her anus was not smeared may not be considered in determining whether our confidence in the outcome of his trial has been shaken by the failure to disclose the witness interviews with Griesert, Eastes and Jones. Appellee's Br. at 45 n. 21. Our conclusion would be the same even without the examiner's testimony as to these two facts. But, as the Commonwealth notes, in *Wood v. Bartholomew*, —— U.S. at ——, 116 S.Ct. at 11, the Supreme

rine, rather than a more common lubricant, was used to facilitate the anal sex, J.A. at 149, 156, only further supports that the intercourse with Stell was not consensual. Of course, in the single instance in which Stell supposedly engaged in anal sex consensually, she had used a more common lubricant, Vaseline.

Viewed against the backdrop of this overwhelming evidence that Stell was raped, most of which the district court did not even mention in its discussion of the materiality of the witness statements, *see* J.A. at 1299–1300, we refuse to believe it reasonably probable that the single incident of anal intercourse recited by Griesert (and the occasional consensual intercourse with Eastes and Jones) would have caused the jury to consider the incident between Ronald Hoke and Virginia Stell any differently. Stell was found murdered in the position in which she was sodomized, with her wrists and ankles bound, with her mouth gagged, with contusions on her arms, and with margarine in and around her anus. In our judgment, the mere fact that this middle-aged, single woman had had consensual intercourse on several occasions in the past could not possibly create a reasonable doubt as to whether Stell was raped by Hoke on the night of October 4, 1985. Our confidence in the jury's verdict having not been disturbed in the slightest by the information allegedly withheld from Hoke in violation of *Brady v. Maryland, see Kyles,* —— U.S. at ——, 115 S.Ct. at 1566, we reverse the judgment of the district court holding Hoke's predicate rape conviction unconstitutional.

Our reimposition of Hoke's predicate rape conviction would alone require reversal of the district court vacatur of Hoke's death sentence. *See Hoke v. Commonwealth,* 377

S.E.2d at 600 (noting that "a finding of guilty on any one of the [three] underlying felonies would ... support[ ] [Hoke's] capital murder conviction."). But, as we conclude below, Hoke's capital murder conviction is supported, as well, by the jury's unassailable findings that Hoke also murdered Stell during the commission of robbery and abduction.

### III.

Hoke was convicted of the predicate offenses of robbery and abduction, in addition to rape. The district court also invalidated both of these convictions, first holding that Hoke was "actually innocent" of murder in the commission of these offenses. Having held that Hoke was "actually innocent" of these predicate offenses, such that he was not barred from presenting his claim under *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the district court then went on to hold that the Commonwealth had, in violation of Hoke's due process rights, knowingly introduced false testimony of Hoke's fellow inmate, Emmett Sallis, and that the robbery and abduction findings supporting Hoke's capital murder conviction could not stand. The Commonwealth argues that the district court erred in invalidating Hoke's robbery and abduction predicate offenses, each of which independently supported Hoke's capital murder conviction. We agree with the Commonwealth that the district court erred in invalidating these predicates, as well.

■ Although Hoke never raised in either of his two previous state *habeas* petitions his *Napue* claim that Preston had knowingly allowed Sallis to testify falsely, and thus procedurally defaulted this claim,[7] the district

---

Court itself considered testimony by the habeas petitioner's cellmate which had not been given during the guilt phase of the trial, but only at the sentencing phase, in holding that its confidence in the outcome of the petitioner's murder trial had not been undermined by the prosecution's failure to disclose certain polygraph results:

> In the face of this physical evidence, as well as [the testimony of the witness in question and another witness]—*to say nothing of the testimony by [the habeas petitioner's cellmate] that the State likely could introduce on retrial*—it should take more than supposition on the weak prem-

ises offered by [the habeus petitioner] to undermine a court's confidence in the outcome.
*Id.* (emphasis added).

7. The district court correctly held that Hoke procedurally defaulted his *Napue* claim under Virginia's contemporaneous objection rule when he failed to object at trial, *see Waye v. Townley,* 871 F.2d 18, 19 (4th Cir.1989), *cert. denied,* 491 U.S. 910, 109 S.Ct. 3202, 105 L.Ed.2d 710 (1989), as well as under Code of Virginia section 8.01–654 ("[n]o writ [of *habeas corpus* ] shall be granted on the basis of any allegation the facts of which

court concluded that Hoke was not barred from raising the claim in his federal *habeas* petition because Hoke was "actually innocent" of the predicate crimes of robbery and abduction. *See Sawyer v. Whitley*, 505 U.S. 333, 348, 112 S.Ct. 2514, 2523–24, 120 L.Ed.2d 269 (1992) (in order to qualify for the "actual innocence" exception to the procedural bar, a petitioner must show "by clear and convincing evidence that but for constitutional error, no reasonable juror would find him eligible for the death penalty under [state] law"); *see also Schlup v. Delo*, ___ U.S. ___, ___ n. 44, 115 S.Ct. 851, 867 n. 44, 130 L.Ed.2d 808 (1995) (recognizing "*Sawyer*'s more rigorous standard to claims involving eligibility for the sentence of death ...". In reaching this conclusion, the district court reasoned that Sallis testified falsely (and that the prosecution had knowingly suborned that perjury in violation of *Napue*), and that absent Sallis' testimony, which would not have been introduced absent constitutional error, no reasonable juror could have concluded that Hoke was guilty of murder in the commission of robbery or abduction. *See* J.A. at 1295–96.

For the reasons that follow, we conclude that the district court clearly erred in finding that Sallis' testimony was false, and therefore erred in its holding that the state had knowingly presented false testimony in violation of *Napue*. We also conclude that even had the district court been correct that Sallis' testimony was admitted through constitutional error, it erred in holding that Hoke has shown by clear and convincing evidence that, absent Sallis' testimony, no reasonable juror would have found him guilty of murder in the commission of robbery and abduction. We therefore hold that Hoke was procedurally barred from raising the *Napue* claim, *see supra* note 7, although, as will be apparent, we view that claim as meritless in any event.

A.

■ In determining that Hoke was "actually innocent" of murder in the commission of robbery and abduction, the district court first held that Hoke's due process rights under *Napue* were violated because Emmett Sallis testified falsely as to his conversation with Hoke regarding Stell's murder, and the Commonwealth knowingly presented this false testimony to the jury.

Sallis was housed in the same cellblock as Hoke in Petersburg Jail. The prosecution called Sallis as one of its witnesses at trial, and Sallis testified as follows:

> [Hoke] said he had a murder charge. And he said the charge that it happened on Union Street and that he was living in Maryland and he came down here on different occasions because he knew the woman. He sold drugs to the woman or somebody in that apartment complex. And he said that they had went out that day and when he came back, because he was supposed to sell some drugs to her and he found out that she had ripped him off, so he found out he couldn't get his stuff back so he killed her.

J.A. at 202. The district court identified no evidence even suggesting that this testimony was false, and there is nothing in the record that suggests this testimony was false. Sallis has never recanted this testimony. Hoke has never suggested that he did not have a conversation with Sallis in which he described the events of the day in question in the way that Sallis represented; Hoke's attorney, in fact, urged the jury in closing argument to *credit* a portion of Sallis' testimony, arguing that the testimony tended to prove that no robbery occurred at all. *See* J.A. at 312–313. And no other testimony calls into question Sallis' veracity in testifying as he did. The district court's contrary

---

petitioner had knowledge at the time of filing any previous petition") when he failed to raise this claim in his two previous state *habeas* petitions. And, clearly, Hoke cannot establish "cause" for that default. As the district court noted:

> [T]he factual basis of Petitioner's claim regarding the falsity of Sallis' testimony arose at the time of Preston's closing arguments to the jury. Specifically, the same day that Sallis testified

that Petitioner had known Stell previously, Preston stated three times that Stell "just met" the Defendant. Preston also told the jury that she "decided to befriend" Petitioner. Clearly, any claim that these statements were false and contradicted Preston's own theory of the case could have been raised at trial.

J.A. at 1286–87.

conclusion that Sallis perjured himself when he testified as to his conversation with Hoke (and that Preston suborned that perjury) is simply without any support in the record.

The principal ground for the district court's conclusion that Sallis had perjured himself appears to be that Preston, the Assistant Commonwealth Attorney who prosecuted Hoke, personally believed that Hoke had not known Stell prior to the day of the murder.

Preston did testify that he never believed that Hoke previously knew Stell, or that it was at least his "impression" that Hoke had not previously known her. J.A. at 1014. That Preston believed that Hoke had not known Stell, however, does not prove that Sallis testified falsely. Even if Sallis had testified that Hoke had known Stell previously, or that he at least believed that they had known each other previously, Preston's contrary belief would not establish that Sallis was testifying falsely. Sallis, however, did not even testify that Hoke had previously known Stell; contrary to the district court's belief, Sallis testified only that Hoke had told him that he had previously known Stell,[8] as even Hoke acknowledges throughout his submissions. The district court, it is quite apparent, simply misread Sallis' testimony in this critical respect. See, e.g., J.A. at 1289–90 ("[T]he only reasonable reading of Sallis' testimony is that he stated that Petitioner had a prior relationship with Stell"); id. at 1288 ("Sallis testified that Petitioner previously knew Stell."); id. at 1291 ("Preston placed Sallis on the stand to testify falsely to a prior relationship between Stell and Petitioner."); id. at 1294 ("The testimony of Emmett Sallis, that Stell and Petitioner knew each other....").[9]

Preston's belief that Hoke and Stell had not known each other obviously does not disprove that Hoke told Sallis that he had previously known Stell. Preston's testimony as to his belief therefore provides absolutely no basis for a finding that Sallis' testimony was false. Of course, Preston's mere "beliefs" or "impressions"—even if they had been directly contradictory in substance to Sallis' testimony—could not suffice in any event to establish that he *suborned* perjury. *See, e.g., Bank of Nova Scotia v. United States,* 487 U.S. 250, 261, 108 S.Ct. 2369, 2377, 101 L.Ed.2d 228 (1988) ("Although the Government may have [ ] doubts about the accuracy of certain aspects of [evidence], this is quite different from having knowledge of falsity."); *Stockton v. Com. of Virginia,* 852 F.2d 740, 749 (4th Cir.1988) (" 'A *habeas corpus* petitioner must show that the prosecutor or other government officers *knew* the testimony in question was false in order to prevail.' " (internal citations omitted) (emphasis added)), *cert. denied,* 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 822 (1989).

■ The district court's other grounds for concluding that Sallis perjured himself with respect to his conversation with Hoke are likewise insupportable. The district court also rested its conclusion that Sallis lied on a determination that Sallis had "undoubtedly provided perjured testimony when questioned about his police record." J.A. at 1290–91. There is no more evidence that Sallis actually perjured himself regarding his prior criminal record, however, than there is that he perjured himself regarding his conversation with Hoke. During cross-examination, Sallis testified as follows:

8. It is even arguable that Sallis was testifying only to what Hoke understood was the charge against him and the allegations underlying that charge. Sallis began his entire testimony as follows: "Okay, I was in the same cellblock with him and I asked him about his charge, what charge did he have. He said he had a murder charge. And he said the charge [was] that it happened...." J.A. at 202. Sallis then went on to recite the particulars, as set forth above. The uncertainty introduced as a result of this portion of Sallis' testimony reinforces our conclusion that Sallis' testimony was not even arguably inconsistent with Preston's beliefs.

9. The district court's interpretation of Sallis' testimony was in error in a number of other respects, as well. For example, Sallis did not say that Hoke came to Virginia in October 1985 "for the express purpose of engaging in a drug deal," J.A. at 1288; Sallis said nothing at all as to whether Hoke was in Virginia for the purpose of selling drugs. And, Sallis did not testify that Hoke said he killed Stell "in an attempt to 'get his stuff back'," id.; he testified that Hoke told him that he killed Stell because "he couldn't get his stuff back." J.A. at 202.

Q. Mr. Sallis, have you ever been convicted of a felony or a crime involving lying, cheating or stealing?

A. Yes, I have.

Q. What is that?

A. Grand larceny.

Q. Are you currently in jail on a felony?

A. Yes, sir, I am.

Q. Is that the grand larceny?

A. Yes.

Q. Any other felonies?

A. Forgery.

Q. What about misdemeanors?

A. Nothing but a car offense, driving license, something like that.

Q. Did you say car theft?

A. No, a car offense; driving on revoked license.

J.A. at 204. The district court concluded that Sallis had perjured himself during this brief colloquy because, although he testified to convictions for grand larceny, forgery, and driving on a revoked license, he failed to testify to prior convictions for petty larceny, accessory after the fact to breaking and entering, receiving stolen merchandise, obstruction of justice, and several traffic violations. J.A. at 852–853.

In our view, it is highly unlikely that Sallis intentionally omitted reference to his other convictions. It appears almost to a certainty that his omissions were attributable either to confusion or understandable oversight on Sallis' part, or to inartful questioning by defense counsel. But even assuming that Sallis did intentionally omit reference to some of his prior convictions (a reason for which, in this context, we cannot imagine), the omissions were obviously of such insignificance, given that he testified to convictions for grand larceny, forgery, and driving on a revoked license, that any inference from these omissions that he was lying when he testified as to his conversation with Hoke would be wholly unwarranted.

It appears that, in fact, Hoke had never actually been convicted of grand larceny; he had been charged with that offense, but convicted only of receiving stolen merchandise. J.A. 829, 833–35, 852–53, 857. Thus, Hoke essentially did testify to a conviction for receiving stolen merchandise, albeit through misdescription. Even assuming that Sallis had been convicted of a second receipt of stolen merchandise offense, see J.A. at 836–37, it is not at all unlikely that he believed he had already testified to that conviction when he testified, through misdescription, to the first conviction for receipt of stolen merchandise. Even if he did not so believe, and even if this conviction and his conviction for obstruction of justice, see J.A. at 852, were both felonies, Sallis' failure to testify to these offenses most probably was a consequence of defense counsel having abruptly changed the line of questioning so as to ask Sallis about misdemeanors for which he had been convicted, before he finished testifying to his felony convictions. Moreover, to the extent that Sallis did not mention his misdemeanor convictions for petty larceny and accessory after the fact, and his several minor traffic offenses (or, for that matter, even his two other felonies), these omissions were clearly sufficiently immaterial, given his testimony to convictions for grand larceny, forgery and driving with a revoked license, cf. United States v. Hoyte, 51 F.3d 1239, 1243 (4th Cir.1995), cert. denied, —— U.S. ——, 116 S.Ct. 346, 133 L.Ed.2d 242 (1995); Fitzgerald v. Thompson, 943 F.2d 463, 467 (4th Cir. 1991), cert. denied, 502 U.S. 1112, 112 S.Ct. 1219, 117 L.Ed.2d 456 (1992), that any inference from their omission that he committed perjury when testifying about his conversation with Hoke would be farfetched indeed.[10]

To a lesser extent, the district court also found support for its conclusion that Sallis perjured himself with respect to the conversation with Hoke in the asserted facts that first, Ray Lupold, Preston's predecessor as prosecutor in this case, believed (like Pres-

---

**10.** For the same reason, Hoke's claim that his due process rights under *Brady* were violated because the Commonwealth did not inform him of these convictions is without merit. *See, e.g.,* *Hoyte,* 51 F.3d at 1243 ("[F]urther impeachment of [the witness] would not, within reasonable

probability, have caused a different result."); *Fitzgerald,* 943 F.2d at 467 ("For purposes of impeachment, the difference between one felony conviction and two or three convictions is not critical. In either case, the jury would be on notice that [the witness] was a convicted felon.").

ton) that Hoke met Stell the day of the murder, J.A. at 1290; second, that there was an absence of other evidence in the record supporting that Hoke knew Stell prior to the day of the murder, J.A. at 1291; and, finally, that the "unrefuted documentation from Central State Hospital in Petersburg [Virginia] establishes that petitioner was confined in that institution from late September until October 4, 1985, ... [thereby making] Sallis' statement that Petitioner *came to* Virginia for the specific purpose of engaging in a drug deal ... patently false," J.A. at 1290 (emphasis added).

Neither the first nor second of these grounds remotely suggests that Sallis testified falsely concerning his conversation with Hoke. Lupold's belief, of course, is no more evidence that Sallis was lying than is Preston's identical belief. And the absence of other evidence (beyond Hoke's own self-serving testimony) that Hoke knew Stell previously, in no way proves that Sallis was lying when he testified that Hoke had told him that he had known Stell before the night of the murder.

As 'to the third ground, Sallis never testified that Hoke had come to Virginia from Maryland *the day of the murder and for the specific purpose of engaging in a drug deal;* indeed, he did not even testify that Hoke had told him that he had come to Virginia on that day and for that purpose. Sallis testified only that Hoke told him that he (Hoke) had *previously* come to Virginia from Maryland (and, at that, not to sell drugs, but rather, "because he knew [Stell]") and that, on the day of the murder, he was "supposed to sell some drugs" to Stell. In other words, Sallis never testified either that Hoke came to Vir-

ginia from Maryland on the day of the murder or that Hoke told him that he had done so; nor did he testify that Hoke came to Virginia on the day of the murder in order to sell drugs, or that Hoke told him that he had come to Virginia for that purpose. Thus, contrary to the district court's belief, Sallis' testimony is not in any way at all inconsistent with the "unrefuted documentation from Central State Hospital in Petersburg establish[ing] that petitioner was confined in that institution from late September until October 4, 1985."

In short, the record is devoid of *any* evidence to support the district court's conclusion that Sallis' testimony was false, and necessarily, therefore, devoid of any evidence that Preston knowingly suborned perjury by Sallis.

### B.

After holding that the prosecution had knowingly suborned Sallis' false testimony in violation of *Napue*, the district court, in the second phase of its "actual innocence" analysis, went on to conclude there was clear and convincing evidence that, absent Sallis' testimony, no reasonable juror would have found Hoke guilty of murder in the commission of either robbery or abduction. We disagree with this conclusion of the district court, as well.[11]

### 1.

The district court acknowledged that "[i]t is undisputed that ... pills were taken *after* Stell's murder and detention, and that Petitioner confessed to the unlawful taking," J.A. at 1292 (emphasis in the original), but it

---

11. The district court's opinion actually is riddled with contradictions regarding the extent to which Hoke's convictions for the predicate crimes of robbery and abduction were dependent upon Sallis' testimony. On the one hand, the district court stated that "[t]he testimony of Emmett Sallis, *that Stell and Petitioner knew each other* and that Petitioner was bent on 'getting his stuff back,' was *critical* to the robbery and abduction convictions." J.A. at 1294 (emphasis added). The court pronounced that "[a]side from Petitioner's confession that he took pills from Stell *after* the murder, the *linchpin* of the Commonwealth's case with respect to the robbery and abduction predicates was the testimony

of Sallis." J.A. at 1288 (second emphasis added). On the other hand, the district court undermines its own postulate by stating in the very next paragraph of its opinion that "Preston's closing argument [to the jury] unequivocally reflects his belief that Stell and Petitioner were previously unacquainted." J.A. at 1288; *see also* J.A. at 1287 (noting that Preston stated three times during his closing argument that Stell had "just met" the defendant). If Sallis' testimony had, as the district court believed, contradicted Preston's own theory of the case, it is difficult to understand how that testimony at the same time could have been the "linchpin" of the robbery and abduction convictions.

nonetheless held that, absent Sallis' testimony, there was no evidence from which a juror could conclude that Hoke murdered Stell during the commission of a robbery. According to the district court,

> [Hoke's] admission [that he had stolen the pills from Stell's room after murdering Stell] standing alone ... was patently insufficient to establish the robbery ... predicate[ ] beyond a reasonable doubt.... Accordingly, absent the Commonwealth's unconstitutional conduct with respect to proffering Sallis' testimony, there would have been a *dearth of evidence* ... that Petitioner was motivated by a common criminal design in killing Stell and taking her pills.... Indeed, the learned trial judge expressed the possibility that Petitioner's taking of the pills was nothing more than an *"afterthought"*.

J.A. at 1292–93 (emphasis added). It is unclear whether the district court believed that, because the robbery occurred after the murder, as a matter of law the jury could not find that Hoke committed a murder in the course of a robbery, or whether it instead believed merely that Hoke's admission alone that he stole the pills from Stell after the murder (*i.e.*, without Sallis' testimony) was not supported by sufficient other evidence that the jury's finding of murder during the commission of robbery could be sustained. Whether the district court invoked the first or the second line of reasoning, it was plainly in error.

■ If the district court believed that the mere fact that the robbery occurred after the murder conclusively established that the murder did not occur during the commission of the robbery, it was in error under our recent decision in *Savino v. Murray*, 82 F.3d 593, 601 (4th Cir.1996), *cert. denied*, — U.S. —, 117 S.Ct. 1, — L.Ed.2d — (1996). There, we held that "[t]he fact that stealing occurs after the killing does not prove that the decision to steal was an afterthought and [that] the two crimes were unrelated," and that "a killing which takes place *before, dur-*

*ing, or after the robbery* and is so closely related thereto in time, place, and causal connection as to make the killing part of the same criminal enterprise as the robbery" constitutes murder in the commission of robbery within the meaning of Code of Virginia section 18.2–31.[12] *Id.* (internal quotations omitted); *see also Whitley v. Commonwealth*, 223 Va. 66, 286 S.E.2d 162, 166 (1982) ("[T]he fact that the larceny did not occur until after [the defendant] had killed his victim does not prove that his decision to steal was an afterthought. And the jury logically could conclude that ... [the] robbery motivated his conduct."), *cert. denied*, 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982).

■ If the district court understood that the mere fact that the robbery occurs after the murder does not negate the possibility of felony murder based upon that robbery, and simply concluded instead that, absent Sallis' testimony, no reasonable juror would have convicted Hoke of robbery, it also erred. Even absent Sallis' testimony (which we hold today was properly considered by the jury), there was an abundance of evidence from which a reasonable juror could conclude that Hoke murdered Stell during the commission of a robbery. In no event, can it be said that there exists clear and convincing evidence that, but for Sallis' testimony, no reasonable juror would have found Hoke eligible for the death penalty for murder during the commission of a robbery. *Sawyer*, 505 U.S. at 348, 112 S.Ct. at 2523–24.

The facts in this case establish that Hoke was a drug user, that he had only about three dollars in his pocket when he killed Stell, that after killing Stell he ransacked her apartment, and that after ransacking her apartment he stole pills out of her purse. Hoke testified at trial that he was a drug user, *see* J.A. at 238–39, 252, 258, and that when he killed Stell, he had only about three dollars in his pocket, J.A. at 263. Indeed, Hoke himself confessed that after killing Stell, he went "through the victim's purse

---

12. Code of Virginia § 18.2–31 provides:

*Capital murder defined; punishment*—The following offenses shall constitute capital murder, punishable as a Class 1 felony:

...

(4) The willful, deliberate and premeditated killing of any person in the commission of robbery while armed with a deadly weapon.

... remov[ing] a quantity of prescription drugs [and then] departed from the apartment." J.A. at 808. He described his search for the drugs as follows:

I went to the bedroom, I emptied out two like dresser drawers, and I went to the living room and it was a purse laying there. I looked in it and saw some pill bottles, I dumped it out and it was a bottle of Xanax in there and I took it.

J.A. at 239. And the police described Stell's apartment at the time she was found as having been "in a state of disarray.... Articles were pulled out upon the floor. Victims (sic) purse and contents were pulled out. Smoke detector was pulled from the ceiling socket." J.A. at 773. Although the facts of the first theory that we held supported the capital murder conviction in *Savino* are not identical to those here, they are sufficiently similar that that case confirms the validity of Hoke's robbery predicate:

[A] reasonable person could find that [the petitioner] committed robbery in connection with [the victim's] murder. The record shows that [the petitioner] was in possession of [the victim's] wallet when he was arrested. He admitted that he took [the victim's] cash immediately after the murder and that he stole jewelry and other property belonging to the victim when he returned to the house later that night. He also told police that he had been planning to murder [the victim] and then to escape with a friend to "South America or Mexico or something like that" afterward. Although there was some evidence that the plan never existed, a reasonable person could find the scheme linked to Savino's theft of [the victim's] money and jewelry. *In addition*, because [the petitioner] also told police, "all I wanted is the cocaine," the Commonwealth could have succeeded in arguing that [the petitioner's] drug habit induced both the killing and the robbery. *Either theory* would satisfy the capital murder requirement that robbery was a motive that existed at the time of the killing.

82 F.3d at 601 (emphasis added). Thus, contrary to the district court's belief, even absent Sallis' testimony, it simply cannot be said that Hoke has established by clear and convincing evidence that no reasonable juror would have convicted him of murder during the commission of a robbery.

2.

■ The district court likewise concluded that absent Sallis' testimony, there was a dearth of evidence to support Hoke's predicate abduction conviction. We disagree.

The district court was silent on the first requirement of abduction, that there be a "detention" of the victim by the abductor "separate and apart from, and not merely incidental to, the restraint employed in the commission of the other crime[s]" of rape and robbery, *Hoke*, 377 S.E.2d at 600 (quoting *Brown v. Commonwealth*, 230 Va. 310, 337 S.E.2d 711, 713 (1985)). It is evident, however, as the Virginia Supreme Court held, that this requirement has been met:

In the present case, Stell's wrists and ankles were bound securely with ligatures, her mouth was gagged tightly, and she was detained for a lengthy period. Applying the *Brown* rule to these facts, we conclude that Stell's detention was greater than 'the kind of restraint that is inherent in the act of rape,' or in the commission of robbery. Thus, we hold that the evidence supports the jury's finding that Hoke killed Stell in the commission of abduction.

*Hoke*, 377 S.E.2d at 600 (internal citations omitted) (emphasis added).

As to the second requirement, that there be an "intent to extort pecuniary benefit" or money, *Cardwell v. Commonwealth*, 248 Va. 501, 450 S.E.2d 146, 152 (1994), *cert. denied*, — U.S. —, 115 S.Ct. 1826, 131 L.Ed.2d 747 (1995), the district court inexplicably held that there was a "lack of *any* evidence demonstrating an intent to extort money or pecuniary gain (i.e., the pills)." J.A. at 1292 (emphasis in the original). From the testimony that Hoke was a drug user, that he had only three dollars in his pocket when he murdered Stell, that he bound and gagged Stell, and that he ransacked her apartment in search of drugs, a reasonable juror clearly could conclude that Hoke abducted Stell with the intent to steal from her either drugs, money, or both. Most

certainly there is not, in light of this evidence, clear and convincing evidence that no reasonable juror would have found Hoke eligible for the death penalty based upon the abduction predicate, absent Sallis' testimony (which we hold today was properly admitted anyway).

Because Hoke has failed to establish that he is "actually innocent" of the murder of Virginia Stell during the commission of robbery and abduction, the district court erred in considering the merits of Hoke's *Napue* claim, and therefore in holding ultimately that Hoke was unconstitutionally convicted of the death penalty for the murder of Virginia Stell during the commission of these offenses. From the foregoing analysis, it is apparent that Hoke's *Napue* claim is meritless in any event.

### CONCLUSION

The judgment of the district court granting the petitioner's writ of *habeas corpus* is reversed and the case is remanded with instructions to reinstate Hoke's death sentence as imposed by the Commonwealth of Virginia.

*REVERSED.*

K.K. HALL, Circuit Judge, dissenting:

This case has two villains. The first, of course, is the appellee Ronald Hoke, who committed a brutal murder and deserves a fitting punishment.

The other villain, prosecutor Joseph Preston, left no legal or ethical corner uncut in his pursuit of Hoke's conviction and death sentence. The district court held that Preston's suppression of exculpatory evidence and knowing sponsorship of false testimony deprived Hoke of a fair trial. I agree with the district court, and I respectfully dissent.

### I.

Inasmuch as the majority and I have very different views on which facts are relevant to this appeal, I will make a counterstatement of facts. I beg the reader's indulgence of the inevitable repetition of some facts; I have attempted to keep them to the minimum required for coherence.

Hoke was released from a mental hospital on October 4, 1985, where he had been a voluntary patient for nearly a week. Hoke's mental problems stem from extreme drug and alcohol abuse. He had planned to go from the hospital to Hagerstown, Maryland, to be near his family and to receive follow-up treatment.

This plan did not last long. Hoke cashed in his bus ticket and bought drugs and alcohol.[1] Either that afternoon or the next, Hoke met Virginia Stell at the European Restaurant in Petersburg, Virginia. Aside from the fabricated statement of Emmett Sallis, a jailhouse snitch (of whom more soon), there is no evidence that Hoke and Stell knew one another.

Stell was 56 years old and had a reputation for easy morals. A patron of the European, Louella Robinette, saw Hoke and Stell hugging and kissing, and the pair later left together.

On October 7, Stell's nude body was found in her apartment. She had been bound, gagged, and stabbed to death. Semen was found in her vagina and anus, and margarine was smeared on her anal ring. The apartment was in disarray.

Meanwhile, Hoke had gone back to the mental hospital. He was soon released and returned to Hagerstown. On October 15, he confessed to a police officer that he had killed a woman in Petersburg, Virginia.

Hoke gave three confessions. His story remained more or less the same: he went to Stell's apartment, where the two had consensual vaginal and anal sex. The anal sex was Stell's idea. He then bound, gagged, and stabbed her. Before fleeing, he decided to look around the apartment for drugs, and he did steal some pills. The only major inconsistency in his confessions concerns when his intent to kill was formed. In his third and final confession, on October 17, Hoke stated

---

1. A psychiatric report states that he may have been under the influence of heroin, PCP, co-   caine, and alcohol at the time of the murder.

that he had decided to kill Stell before they ever got to her apartment; on the other occasions and at trial, he stated that he flew into a rage when Stell slapped him over some sort of transgression.[2]

Soon after the murder, the Petersburg police began interviewing numerous potential witnesses. Their efforts focused on the other residents of Stell's apartment building and the regular patrons of the European Restaurant.

The police learned that Stell was sexually promiscuous. Several witnesses stated that Stell would "go with anyone." A few witnesses even named names, which led police to interview three men, all of whom admitted having had intercourse with Stell. Lowell Eastes, a married man, said that he had had sex with Stell on several occasions, the last time about three weeks before the murder. Dale Griesert reported 15–20 sexual encounters, at various locations—the woods, a motel, a friend's house in the country, or a parked car. Griesert also stated that they had engaged in oral, vaginal, and (on one occasion) anal sex. The anal sex was Stell's idea, and she brought vaseline along for that purpose. Henry Jones also admitted a single encounter with Stell. Finally, Robinette told police about her observation of Hoke and Stell openly hugging and kissing at the European.

The original prosecutor was Raymond Lupold. Lupold, like Hoke and Stell, is white. Lupold's then-boss, Commonwealth's Attorney Sydney Barney, is also white. Lupold took a look at the results of the investigation—a mentally unstable, intoxicated defendant and a victim of limited repute—and decided he "didn't have much of an opportunity to seek the death penalty at that stage." Hoke was charged with first-degree, but not capital, murder.

There was an election that fall, and James Hume became the new Commonwealth's Attorney. Hume is black. Lupold left the office at the close of Barney's term, January 1, 1986, and Joseph Preston took over the Hoke case. Preston is also black. On Feb-

ruary 7, Hoke was charged with capital murder.

Hoke was represented by a public defender, Richard Beck. Beck withdrew from Hoke's case at the preliminary hearing because of a conflict of interest. Beck also represented Emmett Sallis, a Petersburg jail inmate, who was facing numerous charges and was hoping to use Hoke's case to his advantage. John Maclin was then appointed to represent Hoke.

Maclin found the investigation hard going. He went to the European Restaurant to try to find out about Stell, but was met with tight lips and outright hostility, including at least one physical threat. He learned only that Stell had a bad reputation, with no specifics at all.

Maclin filed standard discovery requests, including one for exculpatory evidence on either the issue of guilt or punishment. In the first of several divergences from truth he authored, sponsored, or knowingly suffered, Preston replied that the Commonwealth was unaware of any exculpatory evidence other than Hoke's "alleged drug problem."

Plea negotiations were even less fruitful. Maclin made the capital defendant's last-ditch offer—a life sentence in return for a guilty plea—but Preston declined any deals. Why? As he told Maclin, Preston *"wanted to be the first black man to put a white man in the electric chair."*

A one-day trial was held on August 5, 1986. One of Preston's witnesses was Emmett Sallis, who recounted a conversation he had supposedly had with Hoke in the Petersburg jail:

> Okay, I was in the same cellblock with [Hoke] and I asked him about his charge, what charge did he have. He said he had a murder charge. And he said the charge that it happened on Union Street and that he was living in Maryland and he came down here on different occasions because he knew the woman. He sold drugs to the woman or somebody in that apartment

---

**2.** At trial, Hoke testified that his October 17 statement was a result of his self-destructive state of mind—i.e., he was seeking punishment.

complex. And he said that they had went out that day and when he came back, because he was supposed to sell some drugs to her and he found out that she had ripped him off, so he found out he couldn't get his stuff back so he killed her.

Just a week before this testimony, Sallis had been sentenced to 17½ years in prison on numerous forgery, uttering, and petit larceny charges, all but five of which were suspended on condition that *he continue to cooperate with law enforcement authorities*. It is obvious that this "cooperation" meant assistance to Preston in Hoke's case.

Sallis had originally been charged on February 3, 1986. Two days later, he met with Preston, and, two days after that, Beck withdrew as Hoke's counsel. Sallis pled guilty to the charges within three weeks, but his sentencing was continued. On April 16, Sallis was *released* on a reduced bond, even though he was facing a lengthy prison term and had recently failed to appear on an unrelated grand larceny charge. Hume agreed to the reduced bond.

In sum, Sallis had obviously made a deal with Preston and Hume. On cross-examination, Sallis not only grossly understated his criminal history, but he flatly denied that the Commonwealth had offered "any deals" or "a time cut." True to form, Preston did not correct this testimony.

Preston presented evidence to support the Commonwealth's theory that Stell had been raped. The crime scene itself supports that inference, and experts from the medical examiner's office opined that bruises on Stell's arms indicated a struggle during sex. They also speculated that the margarine on Stell's anus was, somehow, evidence of lack of consent.

In support of his theory that the sex was consensual, Hoke attempted to introduce reputation evidence of Stell's unchaste character.[3] Virginia has a so-called "rape shield" law, which generally prohibits introduction of evidence concerning a supposed rape victim's

bad reputation. The trial court seemed sympathetic to Hoke's argument, but it prohibited the reputation evidence. It suggested that the result might be different if Hoke had evidence of specific conduct. Hoke conceded that he did not. Preston did, of course, but he listened to the colloquy between the court and defense counsel without making a peep.

In his closing argument, Preston painted a picture of Stell as a kind Samaritan:

[L]adies and gentlemen, [Hoke] had just met Virginia Stell, just met Ms. Stell on a jovial weekend, a weekend for festivities, for fun. Ms. Stell was in the European restaurant, out having a drink. Just met the defendant. Apparently, decided to befriend him, unfortunately for Ms. Virginia Stell. But she opened up her heart, ladies and gentlemen. Even invited the defendant into the domicile of her own home. The sacred home, ladies and gentlemen of the jury. The defendant told you, gave him a couple of beers, was being kind to the defendant.

Aside from being completely inconsistent with the testimony of Preston's own witness, Sallis, this argument shows the shenanigans that Preston's suppression of exculpatory evidence made possible. Stell "opened up her heart" and invited Hoke into "the sacred home." I wonder if the mental images conjured in jurors' minds by this peroration would have been different if they had heard, for example, Lois King say that Stell "wasn't picky" and "would take anyone home," or Frank Bridgeman recount that men had been to Stell's apartment many times, where she "fucked them and let them have a bath."

Through phone calls to the expert's receptionist, Preston also obtained a copy of the report of Hoke's psychiatric expert, which is protected by the attorney-client privilege until and unless the defense gives notice of an intent to rely on insanity or mitigating psychological evidence. Va.Code § 19.2–264.3:1(D). Preston later interviewed the psychiatrist as well. Besides contravening

---

3. Robinette, who witnessed Hoke and Stell "hugging and kissing" and could have thereby corroborated Hoke's story, was called as a prosecution witness. However, she made no mention on direct examination of the couple's suggestive ac-

tions, and Preston managed to deflect an inquiry into that subject on cross-examination by interrupting the witness with an objection. Maclin, unaware that he was close to paydirt, dropped the line of questioning.

state law, Preston's actions probably violated the rule of *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (indigent defendant with possible insanity defense is entitled to state-paid psychiatrist to assist in his defense).

The jury found Hoke guilty of capital murder on all three predicates submitted to it: rape, robbery, and abduction.[4] The trial and deliberations had not taken an entire day. The trial court then immediately submitted the sentencing issue to the jury, promising them the next day's jury pay even if they finished up that night.[5] The jury quickly imposed the death penalty, finding that the crime was especially "vile" and that Hoke constituted a future danger to society.

Hoke's conviction and penalty were upheld on direct appeal and on state collateral review. He then filed this action under 28 U.S.C. § 2254. The district court originally dismissed it without holding an evidentiary hearing. *Hoke v. Thompson*, 852 F.Supp. 1310 (E.D.Va.1994). Among the claims dismissed was one under *Ake* for Preston's contacts with Hoke's defense psychiatrist. The court held that any error was harmless under *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), because it did not have a substantial and injurious effect on the verdict.

At this point, Hoke still did not know about the suppressed witness statements. However, he moved to reconsider the dismissal of his petition, asserting that racial animus was at the root of Preston's decision to seek the death penalty. The district court vacated its earlier dismissal and permitted Hoke to amend his petition to assert an equal protection claim.

An evidentiary hearing was set for November 21, 1994. Because Preston's state of mind was at issue, the district court ordered the respondent to produce the prosecution file before the hearing. Alas, Preston's file had "inexplicably disappeared."

As a substitute for the missing file, the Commonwealth offered the Petersburg police file. Hoke did not receive this file until after the hearing. Meanwhile, evidence was taken concerning racial animus. Preston admitted making race-based appeals for support in election campaigns,[6] but he denied Maclin's assertion that he said he was going to be the first black man to put a white man in the chair. Apparently unaware that the police file was about to belie his words, Preston defended his reasons for seeking the death penalty:

> The victim was a nice lady.... But she was very friendly, and that is probably how, what caused her to get killed. She befriended Mr. Hoke, offered him a place to stay, and we all know what she got in return for her attempts to be kind.... So he came to Petersburg, a nice little town where I live at, and picked one of the nicest little ladies in the community to decide to carry out this crime.

The revelations in the police file prompted Hoke to again amend his petition to assert a *Brady* claim and a claim under *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (prosecutor's knowing use of false testimony violates due process). A second evidentiary hearing was held.

On September 7, 1995, the district court granted the writ. The court held, first, that the *Brady* claim had not been waived because the facts in support of it were not known to Hoke. Second, even if the *Brady* claim had been defaulted, the court would find cause for the default and prejudice from the *Brady* violation. The court then held that the *Brady* claim warranted relief.

The merits of the false testimony claim were reached in a different manner. The court held that the falsity of Sallis' testimony was obvious at trial—no one, including Preston, agreed with Sallis that Hoke knew Stell before the day of the murder. The court

---

4. *See* Va.Code § 18.2–31 (listing predicate offenses for capital murder).

5. Given the gravity of the occasion, I think that the judge's haste and the impression he gave the jury that long deliberation may not be necessary

were inappropriate. Hoke does not allege that this haste rose to constitutional error, however.

6. Preston has been a candidate for Commonwealth's Attorney and for the House of Delegates.

held that the claim was defaulted, and there was no "cause" for the default. The court held, nonetheless, that it should reach the claim to prevent a "miscarriage of justice." *Sawyer v. Whitley*, 505 U.S. 333, 339, 112 S.Ct. 2514, 2518–19, 120 L.Ed.2d 269 (1992). The finding of "miscarriage of justice" was based on the court's further holding that Hoke had established that he is "actually innocent" of the robbery and abduction predicates to the death penalty. Sallis' patently false testimony is the only thing supporting those verdicts.[7]

Next, the court found that Preston had actually boasted about putting a white man to death. In fact, the court said it had *no doubt* that Preston had used those words (meaning, of course, that there is *no doubt* that Preston perjured himself at the first evidentiary hearing). Nonetheless, the court declined to find an equal protection violation:

> [T]he comment was hopefully nothing more than prosecutorial posturing, an incendiary aside, mere "talk" or all of the above. [citing testimony that Preston "has a tendency to run his mouth"] Indeed, trial counsel was not even inclined to bring the comment to the trial judge's attention.[cite omitted] Given the paucity of evidence demonstrating purposeful discrimination, Preston's comment standing alone, while reflective of the tenor of the Commonwealth's handling of this case, does not rise to the level of a deprivation of Petitioner's equal protection rights.

## II.

I think that the *Brady* issue is easy. The jury was told that Stell was your average, kindly 56–year–old woman, and the very thought that she had had anal sex with a man half her age, using margarine as a lubricant, probably closed the book on the rape predicate to capital murder. Had the jury known of Stell's aggressive promiscuity, including evidence of consensual anal sex, and that she had been seen "hugging and kissing" Hoke just before her death, it is at least "reasonably probable" that the result would have been different.

The majority assures us that Maclin could have obtained this evidence if he had been diligent enough. I disagree. Maclin was treated with hostility and was subjected to at least one threat when he tried to gather information, and even the police had some difficulty coaxing the truth from Stell's erstwhile bedmates. The district court rightly found that it was unlikely that further inquiries by Maclin would have been fruitful.

The Commonwealth cites the rape-shield statute[8] and argues that the suppressed evidence would not be admissible, and cannot, therefore, constitute exculpatory evidence. I disagree. A Virginia intermediate appellate court has held that the rape shield law must be construed in a manner consistent with the Confrontation and Compulsory Process clauses. *Neeley v. Commonwealth*, 17 Va. App. 349, 437 S.E.2d 721 (1993). As the district court noted, the Sixth Amendment's concern that relevant exculpatory or mitigat-

---

7. Hoke's admitted taking of some pills after the murder does not constitute "robbery" in the sense used in the capital murder statute. Robbery must be the *purpose* of the killing. Except for Sallis' fabrication (Hoke killed Stell to "get his stuff [i.e., drugs] back"), there is no evidence from which a rational trier of fact could find that Hoke killed Stell in hopes that he could later find a few pills. Indeed, on direct appeal, the Virginia Supreme Court relied on Sallis' testimony to affirm the robbery predicate. *Hoke v. Commonwealth*, 237 Va. 303, 377 S.E.2d 595, 599–600, *cert. denied*, 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 709 (1989). The majority appears to question even this interpretation of Sallis' testimony—the only one that could support the robbery predicate—in favor of a simple revenge mo-

tive (Hoke "killed Stell because 'he couldn't get his stuff back.'"). *Ante* at 1360 n. 9.

The abduction predicate hangs by an even thinner thread. A murder during an abduction is punishable by death only where the intended purpose of the abduction is "to *extort* money or a pecuniary benefit[.]" Va.Code § 18.2–31(1) (emphasis added). If the restraint used was no greater than that required to commit the rape or robbery, the defendant cannot be convicted of all three. *Cardwell v. Commonwealth*, 248 Va. 501, 450 S.E.2d 146, 152–153 (1994), *cert. denied*, — U.S. ——, 115 S.Ct. 1826, 131 L.Ed.2d 747 (1995). Even with Sallis' testimony, the evidence of an abduction with intent to extort money or drugs is thin indeed. Without it, there is no evidence at all.

8. Va.Code § 18.2–67.7.

ing evidence be presented to the jury reaches its apogee in death penalty cases.[9]

## III.

The district court found that Hoke had a factual predicate for his *Napue* claim before the trial was even over, so he had to demonstrate cause and prejudice or that a miscarriage of justice would result if relief were not granted. The district court found that a miscarriage of justice would occur here, and with that much I agree.

I am not so certain that a default even occurred, however. Hoke knew that Sallis' testimony was false, but, until the disclosure of the police file, he didn't know that *Preston* knew it was false. The prosecutor is not a guarantor of his witnesses' credibility; he must merely refrain from presenting evidence that he knows or believes to be false. Moreover, some of the falsity of Sallis' testimony—most notably his denial that he had any deals with Preston and the extreme understatement of his criminal history—was by no means apparent at trial.

Upon reaching the merits of the *Napue* claim, I again find the result an easy call. Sallis lied, Preston let him lie, and the lie undermines confidence in the validity of the robbery and abduction predicates for capital murder.[10] A meritorious *Napue* claim requires reversal if " 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *United States v. Kelly*, 35 F.3d 929, 933 (4th Cir. 1994) (quoting *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976)). For the reasons I have already stated,[11] there is much more than a reasonable likelihood; it is all but certain that the error affected the verdict as to the robbery and abduction predicates for capital murder.

## IV.

Ronald Hoke should and must be punished for his crime, and, so long as it affords him a trial that complies with the Constitution, the form of that punishment is up to the Commonwealth of Virginia. It has not yet done so.

In closing, though the issue need not be reached to affirm the grant of the writ, I should say that there is one thing in the district court's otherwise-impeccable opinion that I profoundly disagree with. No one, white or black, ought to be allowed to pick a man for death on account of his race. It has happened in our country, of course, perhaps many more times than our collective shame will ever permit us to acknowledge. Blacks, as an enslaved race for one century and an oppressed one for another, have suffered in gross disproportion. Nevertheless, the sins of the white race will not be purged by offering up Ronald Hoke as a sacrifice to a vengeful black prosecutor. I daresay that if the races of Preston and Hoke were reversed, no court in the land would excuse Preston's racist statement as "posturing" or "mere talk." It is unconstitutional, despicable talk, and, if for nothing else, the writ should issue on Hoke's equal protection claim.

I would affirm.

9. I should add that not all of the suppressed exculpatory evidence concerned Stell's reputation for promiscuity (e.g., Robinette's observation of Hoke and Stell together and evidence of the lenient treatment afforded Sallis contemporaneously with his testimony against Hoke).

10. If this court ruled for Hoke on his *Brady* claim but not on his *Napue* claim, or vice versa, the conviction of capital murder would perhaps be able to stand. Nonetheless, in my view Hoke would be entitled to resentencing, because a Virginia jury always has the discretion to impose life imprisonment notwithstanding that it has found the presence of any or all factors on which a death sentence may be predicated. *Smith v. Commonwealth*, 219 Va. 455, 248 S.E.2d 135 (1978), *cert. denied*, 441 U.S. 967, 99 S.Ct. 2419, 60 L.Ed.2d 1074 (1979); Va.Code § 19.2–264.2. I should say in this regard that I have little doubt that the jury's decision to impose a death sentence rested most heavily on the alleged rape, which, if it happened, was far, far more brutal than any robbery or abduction that might have occurred.

11. *See supra* n. 7.